[Cite as *Sate v. Gonzales*, 2020-Ohio-4495.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
WOOD COUNTY

State of Ohio                                      Court of Appeals Nos. WD-19-068
                                                                                    WD-19-069
          Appellee

                                                        Trial Court Nos. 2018CR0617
v.                                                                        2019CR0096

Jamie Gonzales                                      **DECISION AND JUDGMENT**

          Appellant                                    Decided:  September 18, 2020

* * * * *

Paul A. Dobson, Wood County Prosecuting Attorney, and
David T. Harold, Assistant Prosecuting Attorney, for appellee.

Misty Wood, for appellant.

* * * * *

**ZMUDA, P.J.**

## I.  Introduction

{¶ 1} In this consolidated appeal, appellant, Jamie Gonzales, appeals the judgment

of the Wood County Court of Common Pleas, sentencing him to 66 months in prison

after a jury found him guilty of one count of domestic violence and six counts of

violating a protection order.  Finding no error in the proceedings below, we affirm.

## A. Facts and Procedural Background

{¶ 2} On December 19, 2018, a criminal complaint was filed in the Bowling Green Municipal Court, charging appellant with one count of domestic violence in violation of R.C. 2919.25(A), a felony of the fourth degree. The complaint stemmed from an incident that occurred on December 18, 2018, in which appellant allegedly caused physical harm to his mother, [L.D.], a family or household member, by throwing her on a couch inside his residence, hitting her in her arms, and shoving her head backwards. According to the complaint, appellant was previously convicted of an offense substantially similar to domestic violence, thereby raising the charge from a misdemeanor of the fourth degree to a felony of the fourth degree under R.C. 2919.25(D)(3).

{¶ 3} Upon receiving the criminal complaint, the Bowling Green Municipal Court issued a domestic violence temporary protection order in favor of L.D., in which appellant was ordered not to enter L.D.'s residence and to stay at least 500 feet away from L.D. Further, appellant was restrained from initiating or having any contact with L.D.

{¶ 4} On December 26, 2018, the matter was bound over to the trial court. Thereafter, on January 17, 2019, an indictment was filed in the trial court in case No. 2018CR0617, charging appellant with one count of domestic violence in violation of R.C. 2919.25(A) and (D)(3), a felony of the fourth degree. Appellant entered a plea of not guilty and the matter proceeded through pretrial discovery and motion practice.

2.

**{¶ 5}** Meanwhile, on March 7, 2019, appellant was indicted in case No. 2019CR0096, and charged with six counts of violating a protection order in violation of R.C. 2919.27(A)(2) and (B)(3)(a), felonies of the fifth degree.[1] These charges related to incidents that occurred on January 10, January 19, January 24, January 25, and February 15, 2019. At his arraignment on these charges, appellant entered pleas of not guilty, and the matter proceeded through discovery along with case No. 2018CR0617.

**{¶ 6}** On June 7, 2019, the state filed a notice of its intention to use evidence pursuant to Evid.R. 804(B)(6) at trial, and requested a hearing on the issue. According to the state's notice, appellant "attempted to contact L.D. while incarcerated in the Wood County Justice Center via telephone approximately 173 times. Further, he sent two written letters to L.D., even after he was indicted in case [No. 2019CR0096] for violating the protection order." Moreover, the state asserted that it met with L.D.'s family members, who expressed that L.D. was unwilling to testify at trial. Based upon its claim that L.D.'s refusal to testify was the product of appellant's wrongdoing, the state indicated its intent to introduce at trial the statements L.D. made to police on the day the alleged domestic violence took place.

**{¶ 7}** Five days later, on June 12, 2019, both cases proceeded to a jury trial. Prior to jury selection, the trial court conducted a hearing on the state's notice of its intention to

---

[1] The indictment was subsequently amended prior to trial to reflect six charges of violating a protection order in violation of R.C. 2919.27(A)(1) instead of R.C. 2919.27(A)(2).

3.

use Evid.R. 804(B)(6) evidence. At the hearing, the state called Bowling Green police officer, Michael Clingenpeel, to the stand. Clingenpeel was the officer who arrested appellant in connection with the domestic violence incident at issue in case No. 2018CR0617. Clingenpeel also spoke with L.D. on the night of the incident, and described L.D.'s condition as "visibly upset, crying, and she was fearful. * * * She said she feared for her safety."

{¶ 8} During his testimony at the hearing, Clingenpeel referenced a call log from the Wood County Justice Center, which established that appellant made 173 phone calls to L.D. from the jail while he was awaiting trial. Clingenpeel reviewed the audio recordings of those calls, and testified that appellant appeared to be "interrogating his mom, demeaning her, to the point where she was sobbing on the phone, and her voice appeared that she was afraid." Clingenpeel explained that appellant directed L.D. to appear in court in order to "get rid of the protection order, because [appellant] knew there was a protection order in effect." Clingenpeel described appellant's demeanor on the phone calls as "very demanding" and indicated that appellant was yelling at L.D. during the calls. For her part, L.D. was sobbing on the phone and evading appellant's questions about the protection order.

{¶ 9} Clingenpeel also referenced letters that appellant wrote to L.D. during the pendency of this case. In one such letter, appellant directed L.D. to appear before the trial court to "kill the violation of a protection order" and asked L.D. if she had a "F-in conscience." In another letter, appellant told L.D.: "Don't ever point your F-n finger on

4.

my face, or in my face ever again!  5 months of disrespect is way worse than 15 seconds of disrespect.  Your son is going to be asking you the questions when you're on the stand AGAIN."  Later in the letter, appellant wrote:  "So what kind of PAIN medication do your doctors have you on now [L.D.]?  That will be a question in trial."

{¶ 10} After reviewing appellant's letters to L.D., Clingenpeel testified as to a prior incident of domestic violence involving appellant and L.D. in 2003.  Additionally, Clingenpeel testified that L.D.'s daughter, J.T., and sister, S.D., contacted the police during the pendency of this case and expressed concern for L.D.'s safety in light of the fact that appellant "abuses her all the time."  J.T. and S.D. indicated that L.D. was not going to testify in this case because she was fearful of doing so.  Clingenpeel verified that L.D. was not present at the court despite the fact that a subpoena ordering her presence was previously served upon her.  According to Clingenpeel, L.D. was "crying and upset" when officers served the subpoena upon her at her apartment.

{¶ 11} At the conclusion of Clingenpeel's testimony, the trial court found that the state established by a preponderance of the evidence that L.D.'s absence at trial was due to appellant's wrongdoing.  Consequently, the court ruled that the Evid.R. 804(B)(6) evidence proffered by the state would be admissible at trial.  Thereafter, the matter proceeded to jury selection, opening statements, and the state's case-in-chief.

{¶ 12} J.T. was called to testify as the state's first witness.  J.T. began her testimony by stating that she and L.D. have a close relationship, seeing each other "at least a couple times a week."  Early in the evening of December 18, 2018, J.T. decided to

5.

visit L.D. at her apartment because she had not heard from L.D. for several days despite efforts to reach her via telephone and text message. When she and her 12-year-old daughter arrived at L.D.'s apartment, J.T. observed that L.D. was acting strangely. Specifically, J.T. stated that L.D. was standing in her living room "pacing like a little scared child."

{¶ 13} Meanwhile, J.T. noticed appellant sitting at the computer in the living room and drinking a beer. J.T. testified:

> [A]s soon as I said, what's going on, I kind of turned and looked at him.
> Instantly angry, instantly blows up. * * * Stands up from the computer
> desk, comes over close to where my daughter and my mom are, and starts
> yelling at my daughter, excuse my language, get your fucking bitch cunt
> mom out of here. She is a bitch. She's gotten me in trouble. Just yelling at
> her. And I could see her getting visibly scared of him.

{¶ 14} Upon noticing appellant's aggressive behavior toward her daughter, J.T. grabbed her daughter's hand and the two left the apartment. J.T. proceeded to return to her home, where she dropped her daughter off. Thereafter, J.T. met up with her boyfriend, Ben, who called the police as the two returned to L.D.'s apartment.

{¶ 15} When J.T. and Ben arrived back at the apartment, accompanied by police, Ben knocked on the door and announced that he wanted to speak to L.D. Appellant opened the door, noticed the police officers, and attempted to shut the door. Ben interfered by placing his foot in front of the door. Finally, appellant moved out of the

6.

way and, according to J.T., L.D. "came running out of the house and ran into Ben's arms crying, which is very unusual because she doesn't usually do that, I would think she would come to me.  She was scared.  She said, help me."

{¶ 16} Eventually, L.D. was placed into Ben's truck.  J.T. examined L.D. and noticed scratches on her neck and face, as well as bruises on her arms.  Upon questioning, L.D. told J.T. that appellant became angry with her after drinking all day.  Thereafter, appellant grabbed L.D., a 70-year-old woman weighing 117 pounds, and shoved her down multiple times onto the couch in the living room.  During the incident, L.D. hit her head on the hard surface of the couch, which left a "goose egg and redness" on her head.

{¶ 17} After J.T. reported L.D.'s injuries to police, L.D. provided a written statement, which was introduced into evidence as State's Exhibit 8.  According to J.T., L.D. articulated the facts of the incident to her and she "typed everything [L.D.] told me from start to finish."  Thereafter, L.D. reviewed the statement and placed her signature thereon.  In the statement, L.D. reported that appellant spit on her, grabbed her by her coat and threw her down on the couch, picked her up and threw her down again, this time causing her to hit her head on the wooden arm of the couch.  L.D.'s statement indicated that appellant

> continued slapping me and hitting me in my face and neck as I tried to
> defend myself by holding my arms up to block him from hitting me.  Jamie
> was so enraged at this point he was spitting in my face and screaming,

7.

"Bitch, fuck you bitch!" I was so scared I didn't know what to do. I cried but he continued to throw me around. * * * I was paralyzed with fear.

{¶ 18} At the conclusion of J.T.'s testimony, the state called patrolman Kris Garman of the Bowling Green police department as its second witness. Garman was one of the officers who responded to the report of a potential domestic violence incident at L.D.'s apartment on December 18, 2018.

{¶ 19} According to Garman, Clingenpeel had decided that appellant would be arrested for domestic violence by the time he arrived on the scene. Garman took appellant into custody, and transported him to the Wood County Justice Center. Thereafter, Garman spoke to L.D. and obtained her written statement. Garman reported that L.D. was shaking and very fearful at this point, to the extent that she was unable to write the statement herself. Over appellant's objection, Garman testified as to what L.D. stated to him as he questioned her, which mirrored the version of the incident set forth in L.D.'s written statement. While speaking with L.D., Garman noticed her physical injuries and proceeded to take photographs of those injuries, which were introduced into evidence by the state at trial.

{¶ 20} As its third trial witness, the state called Clingenpeel. When he arrived at L.D.'s apartment on December 18, 2018, Clingenpeel spoke with J.T., who informed him that she wanted appellant removed from the apartment. Clingenpeel explained to J.T. that appellant would need to be formally evicted since he is a resident of the apartment.

8.

Thereafter, J.T. informed Clingenpeel that appellant had assaulted L.D. Clingenpeel then spoke with L.D., whom he described as "definitely in fear."

{¶ 21} The dash camera video recording of Clingenpeel's conversation with J.T. and L.D. was introduced by the state as State's Exhibit 7 and played for the jury at trial. In the recording, L.D. can be heard reporting that "he beat me," referring to appellant. L.D. also showed Clingenpeel how appellant threw her on the couch, which Clingenpeel reenacted for the jury.

{¶ 22} Later in his testimony, Clingenpeel referenced the temporary protection order that was issued under R.C. 2919.26 by the Bowling Green Municipal Court on December 19, 2018. Clingenpeel testified as to the salient terms of the protection order, noting that appellant was prohibited from having any contact with L.D., even with her permission. Clingenpeel went on to testify that appellant had contact with L.D. via telephone and handwritten letter on multiple occasions while he was incarcerated at the Wood County Justice Center, in contravention of the temporary protection order.

{¶ 23} Next, Clingenpeel authenticated a telephone log that reported 173 calls between appellant and L.D. beginning on December 18, 2018 and May 6, 2019, which were recorded and reviewed by Clingenpeel prior to trial. Several of the calls were played at trial after they were authenticated by Clingenpeel. Specifically, the stated played a total of eight phone calls between appellant and L.D. that occurred in December 2018 (one on the 21st and one on the 25th), January 2019 (two on the 19th, one on the 24th, and one on the 25th), and February 2019 (two on the 15th).

9.

{¶ 24} After Clingenpeel finished testifying, the state recalled J.T. to the stand to authenticate a June 7, 2019 handwritten letter from appellant to L.D. that the state received during the trial.[2] J.T. testified that she was familiar with appellant's handwriting, which matched the handwriting contained on the letter. In the letter, appellant stated to L.D., in relevant part:

> Go to court and kill the domestic violence protection order. * * * Don't go to trial, [L.D.], or prepare to fight with me on the stand. You have to tell them you do not – you did not want the protection order, period. * * * Your head did not hit the arm of the couch hard at all! Look at the F-in pictures. Learn to control your overmedicated mouth.

{¶ 25} As its final witness, the state called the director of the victim services program for the Wood County prosecutor, Monica Deleon, who testified that she first became aware of the existence of the June 7, 2019 letter on the morning of the second day of trial in this case. She was contacted by L.D.'s niece, who forwarded the letter to Deleon. After receiving the letter, Deleon brought it to the state's attention.

{¶ 26} At the close of the state's case-in-chief, appellant moved for an acquittal under Crim.R. 29, which was denied by the trial court. Appellant elected not to take the stand or call any witness of his own, and the matter proceeded to closing arguments and jury instructions. Ultimately, the jury returned guilty verdicts as to all counts contained

---

[2] Following J.T.'s testimony, appellant stipulated to the authenticity of the June 7, 2019 letter.

in the indictments. Thereafter, the trial court continued the matter for sentencing and ordered the preparation of a presentence investigation report.

{¶ 27} On July 15, 2019, appellant appeared before the trial court for sentencing. After hearing from appellant's counsel, the state, and appellant, the trial court ordered appellant to serve 12 months in prison for a single count of domestic violence in case No. 2018CR0617 and 9 months on each of the six counts of violating a protection order in case No. 2019CR0096. The court ordered the sentences run consecutively for a total prison term of 66 months.

{¶ 28} While imposing sentence, and again in its sentencing entry, the court articulated its consideration of the principles and purposes of sentencing under R.C. 2929.11, as well as the seriousness and recidivism factors under R.C. 2929.12. Further, under R.C. 2929.14, the court stated its finding that consecutive sentencing was necessary to protect the public from future crime and to punish appellant, as demonstrated by appellant's criminal history. The court found that consecutive sentences were not disproportional to the seriousness of appellant's conduct and the danger that he poses to the public.

{¶ 29} Following the sentencing hearing, appellant filed his timely notices of appeal in case Nos. WD-19-068 and WD-19-069 related to trial court case Nos. 2018CR0617 and 2019CR0096, respectively. Thereafter, on November 8, 2019, we issue our order sua sponte consolidating these appeals.

11.

**B. Assignments of Error**

{¶ 30} On appeal, appellant assigns the following errors for our review:

I. The trial court abused its discretion by sentencing Mr. Gonzales to consecutive sentences instead of concurrent sentences.

II. Irreversible error was committed when Mr. Gonzales was not permitted to confront the witness.

{¶ 31} For ease of discussion, we will address appellant's assignments of error out of order.

**II. Analysis**

**A. Forfeiture by Wrongdoing**

{¶ 32} In appellant's second assignment of error, he argues that the trial court erred under Evid.R. 804(B)(6) when it allowed statements made by L.D. to be introduced by the state at trial, thereby infringing upon his constitutional right to confront the witness against him.

{¶ 33} In general, "the admission of evidence lies within the broad discretion of the trial court, and a reviewing court should not disturb evidentiary decisions in the absence of an abuse of discretion that has created material prejudice." *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, ¶ 62, citing *State v. Issa*, 93 Ohio St.3d 49, 64, 752 N.E.2d 904 (2001). However, we review the trial court's decision to admit L.D.'s hearsay statements under Evid.R. 804(B)(6) using a de novo standard of

12.

review since appellant's constitutional right under the Confrontation Clause is implicated. *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, ¶ 97.

{¶ 34} Here, the trial court allowed hearsay evidence to be offered against appellant pursuant to the "forfeiture by wrongdoing" exception set forth in Evid.R. 804(B)(6), which allows introduction of such hearsay evidence if the declarant is unavailable as a witness "due to the wrongdoing of the party for the purpose of preventing the witness from attending or testifying."

{¶ 35} In *McKelton*, the Ohio Supreme Court explained the following regarding Evid.R. 804(B)(6),

> Forfeiture by wrongdoing has long been recognized as an equitable exception to a defendant's constitutional right to confront the witnesses against him. *See Giles v. California*, 554 U.S. 353, 366, 128 S.Ct. 2678, 171 L.Ed.2d 488 (2008); *Reynolds v. United States*, 98 U.S. 145, 158, 25 L.Ed.2d 244 (1878). Ohio codified this doctrine in 2001 as a hearsay exception under Evid.R. 804(B)(6). To admit statements under this exception, a prosecutor must show by a preponderance of the evidence that (1) the defendant engaged in wrongdoing that caused the witness to be unavailable and (2) one purpose for the wrongdoing was to make the

13.

witness unavailable to testify. *See State v. Fry*, 125 Ohio St.3d 163, 2010-Ohio-1017, 926 N.E.2d 1239, ¶ 106; *State v. Hand*, 107 Ohio St.3d 378, 2006-Ohio-18, 840 N.E.2d 151, ¶ 84.

*Id.* at ¶ 96.

{¶ 36} In his brief to this court, appellant argues that the state failed to establish that he caused L.D. to be unavailable for the purpose of preventing her from testifying at trial. Having reviewed the record in its entirety, we disagree.

{¶ 37} At trial, the state introduced evidence to establish that appellant telephoned L.D. over 170 times and wrote her two letters, all while in jail awaiting trial on a charge of domestic violence involving L.D. as the victim, and during the period in which the temporary protection order was in effect. In the audio recordings of some of appellant's phone calls with L.D., appellant is heard aggressively directing L.D. to take action to quash the protection order against him. Further, in one of the letters appellant wrote to L.D., appellant told L.D.: "Don't ever point your F-n finger on my face, or in my face ever again! 5 months of disrespect is way worse than 15 seconds of disrespect. Your son is going to be asking you the questions when you're on the stand AGAIN." Later in the letter, appellant wrote: "So what kind of PAIN medication do your doctors have you on now [L.D.]? That will be a question in trial." According to Clingenpeel, J.T. and S.D. contacted the police during the pendency of this case and indicated that L.D. was not going to testify because she was fearful of doing so, and L.D. was "crying and upset" when officers served the subpoena upon her at her apartment.

14.

{¶ 38} When viewed in light of appellant's acts of domestic violence against L.D., appellant's communications with L.D. had the natural and foreseeable consequence of striking fear in L.D. At least one of appellant's purposes behind paralyzing L.D. with fear was to avoid prosecution, as evidenced by his direct statement to L.D. to quash the protection order. That the communications were wrongful is clear from the fact that appellant's contact with L.D. was in contravention of the temporary protection order that was in place following the filing of the domestic violence charges.

{¶ 39} In sum, we find that the state demonstrated that L.D.'s unavailability was due to appellant's wrongdoing and was designed to prevent her from testifying. Moreover, we find no merit to appellant's Confrontation Clause argument. Indeed, the courts have "explicitly preserved the principle that an accused has forfeited his confrontation right where the accused's own misconduct is responsible for a witness's unavailability." *State v. Hand*, 107 Ohio St.3d 378, 2006-Ohio-18, 840 N.E.2d 151, ¶ 115, citing *Crawford v. Washington*, 541 U.S. 36, 43, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) ("The rule of forfeiture by wrongdoing (which we accept) extinguishes confrontation claims on essentially equitable grounds; it does not purport to be alternative means of determining reliability.").

{¶ 40} Accordingly, appellant's second assignment of error is not well-taken.

### B. Consecutive Sentencing

{¶ 41} In appellant's first assignment of error, he argues that the trial court erred in imposing his sentences consecutively.

15.

{¶ 42} The review of felony sentences is governed under R.C. 2953.08(G)(2). Under R.C. 2953.08(G)(2), an appellate court may increase, reduce, modify, or vacate and remand a sentence only if the record demonstrates, clearly and convincingly, either of the following:

(a) That the record does not support the sentencing court's findings under division (B) or (D) of section 2929.13, division (B)(2)(e) or (C)(4) of section 2929.14, or division (I) of section 2929.20 of the Revised Code, whichever, if any, is relevant; or

(b) That the sentence is otherwise contrary to law.

{¶ 43} Here, appellant argues that the record does not support the trial court's findings pertaining to consecutive sentences under R.C. 2929.14(C)(4), which provides:

(4) If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:

(a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction

imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

{¶ 44} In order to impose a consecutive sentence under R.C. 2929.14(C)(4), a trial court must engage in a three-step analysis. *State v. Banks*, 6th Dist. Lucas No. L-13-1095, 2014-Ohio-1000, ¶ 11. First, the trial court must find the sentence is necessary to protect the public from future crime or to punish the offender. Second, the trial court must find that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public. Third, "the trial court must find that *at least one* of the following applies: * * * (c) the offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender." *Id.*, citing R.C. 2929.14(C)(4)(a)-(c). In articulating its findings, "the trial court it is not required to recite any 'magic' or 'talismanic' words when imposing consecutive sentences provided it is 'clear from the

record that the trial court engaged in the appropriate analysis.'" *Id*. at ¶ 12, citing *State v. Murrin*, 8th Dist. Cuyahoga No. 83714, 2004-Ohio-3962, ¶ 12.

{¶ 45} As noted above in our recitation of the facts, the trial court engaged in the appropriate analysis and made the requisite findings in support of consecutive sentences at the sentencing hearing and in its sentencing entry. Specifically, the trial court found that consecutive sentences were necessary to protect the public from future crime and to punish appellant. Further, the court found that consecutive sentences were not disproportional to the seriousness of appellant's conduct and the danger that he poses to the public. Finally, the court found that appellant's criminal history, which includes a prior conviction for domestic violence, justified the imposition of consecutive sentences under R.C. 2929.14(C)(4)(c).

{¶ 46} While not taking issue with any of the aforementioned findings, appellant argues that the trial court erred in imposing consecutive sentences without making a finding under R.C. 2929.14(C)(4)(b) that two or more of the offenses were committed as part of a course of conduct and that the harm caused by two or more of the offenses was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of appellant's conduct. Appellant's argument ignores the structure of R.C. 2929.14(C)(4)(a)-(c), which permits a trial court to impose consecutive sentences if it finds any of the subsections therein. Pursuant to the plain language of the statute, the trial court's finding concerning appellant's criminal history under R.C. 2929.14(C)(4)(c) was sufficient for the sentence

18.

to pass muster, and there was no need for the court to make additional findings under R.C. 2929.14(C)(4)(a) or (b).

{¶ 47} Ultimately, the trial court imposed a sentence as to each offense that falls within the applicable statutory range, indicated its consideration of R.C. 2929.11 and 2929.12 in imposing appellant's sentence, and made the requisite findings under R.C. 2929.14(C)(4) to support imposing appellant's sentences consecutively, and those findings were supported by the record. Therefore, we find no error in the trial court's sentence.

{¶ 48} Accordingly, appellant's first assignment of error is not well-taken.

### III. Conclusion

{¶ 49} In light of the foregoing, the judgment of the Wood County Court of Common Pleas is affirmed. The costs of this appeal are assessed to appellant under App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.                            _____

                                                               JUDGE

Christine E. Mayle, J. 

Gene A. Zmuda, P.J.                            _____
CONCUR.                                                            JUDGE

                                                               _____
                                                               JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.