[Cite as *State v. Harvey*, 2022-Ohio-4650.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                    Court of Appeals No.  L-22-1029

     Appellee                              Trial Court No.  CR0202101334

v.

Quincy Harvey                              **DECISION AND JUDGMENT**

     Appellant                             Decided:  December 22, 2022

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Brenda J. Majdalani and Rebecca A. Facey, Assistant
Prosecuting Attorneys, for appellee.

Laurel A. Kendall, for appellant.

* * * * *

**PIETRYKOWSKI, J.**

{¶ 1} This matter is before the court on the appeal of defendant-appellant, Quincy

Harvey, from the February 7, 2022 judgment of the Lucas County Court of Common

Pleas which, following a jury trial convicting him of two counts of rape, and one count

each of kidnapping, felonious assault, resisting arrest, and obstructing official business, sentenced him to a minimum of 41 years of imprisonment. Although we find that the court erred in granting the state's motion for forfeiture by wrongdoing, absent the improperly admitted evidence, the sufficiency and manifest weight support the jury's verdicts as to the rape and kidnapping charges. Accordingly, we affirm.

## I. Facts

{¶ 2} Appellant was arrested on March 1, 2021, following an incident at the apartment of his girlfriend, victim, A.D., where she alleged that appellant had beaten her over a course of hours and prevented her from calling for help. A.D. also reported that she had been sexually assaulted. Appellant was indicted on March 9, 2021, on two counts of rape, first degree felonies, one count of kidnapping, a first degree felony, one count of felonious assault, a second degree felony, and second-degree misdemeanors of resisting arrest and obstructing official business.

{¶ 3} In May 2021, A.D. filed an affidavit with the court recanting certain statements she had previously made to police. A.D. stated that on the night in question, she and appellant had gotten into a physical altercation but she denied that he had hit her with a hammer or that he had sexually assaulted her. A.D. stated that she lied to police because she was angry with appellant.

{¶ 4} Based on the affidavit and anticipating that A.D.'s trial testimony would contradict statements made to police on July 27, 2021, the state filed a motion requesting

2.

that A.D. be called as a court's witness, Evid.R. 614(A), thereby allowing the state to question her on cross-examination. On January 13, 2022, the motion was granted.

{¶ 5} In preparation for trial, the state issued subpoenas to serve A.D. for the rescheduled trial date of December 14, 2021, and trial date of January 25, 2022. Both subpoenas were returned and stated that the witness no longer resided at the address. It is undisputed that during the course of the proceedings, despite a no contact order appellant contacted A.D. from jail by telephone and email numerous times and that the proceedings were a frequent topic of conversation.

{¶ 6} The trial in the matter commenced on January 25, 2022. The 911 call placed by A.D. was played for the jury. During the call, A.D. indicated that she was calling from a nearby sister's house and that she had been assaulted by her boyfriend over a course of hours, that he had taken her phone and broken "everything" in the house, and that he hit her with a hammer. A.D. stated that she was walking back to her apartment where her kids were sleeping.

{¶ 7} Testimony was elicited from multiple Toledo Police officers who were dispatched following the 911 call placed by A.D. When officers arrived, A.D. exited the apartment. She had visible injuries, appeared scared and was shaking, and was speaking softly. A.D. injuries included a large, swollen welt on her forehead, and bruises on her arms and legs.

{¶ 8} Entering the apartment the officers witnessed appellant, unclothed with a towel across his body, sleeping on the couch. He had no visible injuries. After multiple attempts, they were able to wake him. According to the officers, appellant was told to stop resisting multiple times and various restraint techniques were used to subdue him and get him into custody.

{¶ 9} The officers testified that based on the condition of the apartment, a struggle had taken place. They observed pillows and clothing strewn about, broken glass, small kitchen appliances on the ground, broken mirrors, a broken television, a bedroom bed and dresser displaced, and the chandelier ripped down from the ceiling.

{¶ 10} Video from the officers' body-worn cameras were played to the jury. Defense counsel objected to the video, specifically the testimonial statements made by A.D., arguing that the admission of such statements was a confrontation clause violation. Counsel voiced an ongoing objection as to the statements. The state countered that the statements were made in the context of an ongoing emergency- the suspect was still in the apartment with A.D.'s children. The court overruled the objection.

{¶ 11} As to the alleged sexual assault, one of the responding officers, the only female, testified that A.D. privately told her that appellant had "forced himself into her." This was reflected in the body-cam video.

{¶ 12} A Toledo Fire fighter and EMT testified that he responded to an "assault and rape" call involving A.D. Summarizing his run report which was admitted into

4.

evidence, the EMT stated that A.D. had injuries to her head and complained of being hit by a hammer. The EMT indicated, over objection, that A.D.'s complaints included that she had been assaulted and raped over the course of two hours. The EMT stated that his report was based solely on what was reported by police at the scene.

{¶ 13} On the beginning of the second day of trial, the state filed a motion pursuant to Evid.R. 804(B)(6), requesting that A.D.'s statements to law enforcement be admitted due to the approximately 1,000 telephone calls and over 3,000 email messages made by appellant to A.D., while in custody at the county jail and in violation of a no contact order, during the pendency of the case. The motion indicated that the focus of many of the exchanges was getting the charges against appellant dismissed. The state claimed that A.D. had not made herself "available" as a witness and that the subpoenas issued to her for the December 2021 and January 2022 trial dates were returned as undeliverable. The state claimed that through the recorded discussions with appellant following the first day of trial, it was established that she was aware that the trial was happening and that her testimony was of "central importance" to the case.

{¶ 14} A discussion regarding the motion was had in chambers. The state first recounted its motion, filed months prior, requesting to have A.D. testify as a court witness due to its belief that she would testify on appellant's behalf. The state noted that A.D. had been in contact with appellant during the pendency of the case and that she had filed an affidavit in May 2021, recanting most of the allegations against appellant.

5.

{¶ 15} The state noted that A.D. had not appeared at trial and it was "unable to get a subpoena in her hand because attempts were returned to the Lucas County Prosecutor's office undeliverable." The state indicated that it was not sure that A.D. was even aware that the trial was taking place until the prior evening when nine telephone calls were made from the jail to A.D. The state indicated that the conversations focused on the trial taking place. Acknowledging that appellant did not specifically tell A.D. not to appear for trial, the state noted:

> [I]n one of the calls last night, when it's clear that the trial is going forward despite both of them hoping that it was going to be dismissed, she suggests that she should come down here and clear all of this up. And while Mr. Harvey does not specifically say, no, no, do not do that, he does dissuade her, and that is not a part of their ultimate plan when getting off the phone.

{¶ 16} The state indicated that, in its view, this was the "tipping point" rendering A.D. "unavailable" under Evid.R. 804(B)(6). Granting the motion, the court stated that based on the totality of the circumstances, including appellant's violation of the no contact order and the sheer number and central topic of the contacts, it was not necessary that the state show that appellant specifically told A.D. not to appear at trial.

{¶ 17} The trial then resumed and testimony was elicited from the SANE (sexual assault nurse examiner) nurse who treated A.D. The SANE nurse stated that she treats

6.

victims of "interpersonal violence" including victims of sexual assault, domestic violence, and strangulation. The nurse stated that once the patient is medically stable, a SANE examination, which includes a detailed history of the event and evidence collection, is conducted. Defense counsel objected to testimony regarding information given by A.D.

{¶ 18} The nurse testified that she immediately noticed that A.D. had visible injuries to her head, face, and arms. The SANE nurse agreed that the history given by A.D. guided the focus of the exam. The nurse read from the detailed assault history where A.D. explained that appellant, her then-boyfriend, beat and strangled her and hit her in the head with a hammer, poured water and coffee creamer on her, destroyed multiple items in the home, and then forced oral and vaginal sex. The SANE nurse testified as to the photographic evidence she collected; the photographs were admitted into evidence. The nurse agreed that there was no vaginal trauma but stated that such a finding has no real bearing on whether she was sexually assaulted. The nurse stated that this is especially true when a victim is menstruating.

{¶ 19} A forensic scientist from the Ohio Bureau of Criminal Investigation (BCI) testified that she works in the DNA section analyzing evidence for the presence of bodily fluids. The scientist conducted testing on samples collected from A.D.'s rape kit which included vaginal, anal, and oral swabs, a hammer, A.D.'s underwear, and a DNA standard from appellant.

7.

{¶ 20} The vaginal samples were negative for appellant's DNA. The scientist explained that when a woman is menstruating it can flush out or mask smaller quantities of DNA (found in a suspect's semen.) Also, if a victim "cleans up" after the assault, DNA can be wiped away. The oral samples were, likewise, negative with the expert noting that saliva continuously filters and cleans the mouth. The testing results from the anal samples, showed evidence of an unknown male contributor.

{¶ 21} As to A.D.'s underwear, the scientist testified that the front panel contained some DNA from an unknown male contributor. The testing of the back panel of the underwear revealed that A.D. and appellant (a non-sperm fraction) were major contributors. The frequency of the occurrence is less than one in one trillion.

{¶ 22} The skin swabs from the left and right sides of A.D.'s face included appellant as a contributor to the DNA profile. The results from the swab from the hammer's wooden handle, revealed no identifiable profile due to the large number of contributors. The swab of the hammer's head showed appellant as the major DNA contributor.

{¶ 23} The DNA expert agreed that the testing of the samples revealed no presence of semen. The expert clarified that because the presumptive test was negative a confirmatory test was not conducted. The report was admitted into evidence.

{¶ 24} Two Lucas County Sheriff resource officers each testified that their responsibilities included monitoring the Lucas County jail's phone system and individual

8.

computer tablets that inmates are assigned upon arrest and booking. The tablets allow inmates to send outside emails and have video visitation. The contact must be initiated by the inmate. When using the tablets, inmates have to enter a specific, individualized pin number. Specific tablet messages can be extracted. The emails or messages between appellant and A.D. listed the recipient as N.W. when, in fact, the email address was A.D.'s. The messages from March 1, 2021 through July 28, 2021, totaled 3,033.

{¶ 25} Telephone call participants are notified that they are being monitored at the beginning of each call. The phone logs are monitored and recorded by an outside company and the recordings can be accessed by the county resource officers. As to appellant, a search was made regarding calls made to two phone numbers associated with A.D. The amount totaled approximately 998. The officer agreed that appellant placed nine phone calls to A.D. the night before; seven of the calls were completed.

{¶ 26} A disc with a phone recording from March 1, 2021, the day of appellant's arrest, was played for the jury. The call had appellant and A.D. discussing the events. A.D. expressed anger at the items destroyed by appellant, the injuries he inflicted upon her and the liquids he dumped on her, and that he forced her to engage in fellatio. Appellant claimed to not remember the incident.

{¶ 27} The state's final witness, Toledo Police Detective Nate Morrison, was assigned to investigate the incident. Morrison stated that he observed appellant while he was still in a holding cell and that he appeared to be intoxicated.

9.

**{¶ 28}** Detective Morrison testified that he met with A.D. while she was being treated at the hospital. Morrison described her injuries as severe bruising and swelling to her head, scratches, red marks, and swelling on her arms and legs. Morrison stated that A.D. appeared fearful, a bit confused, and relieved to be getting help.

**{¶ 29}** Detective Morrison was then asked to recount what A.D. told him; the objection to the testimony was overruled. A.D. first described the property destroyed by appellant. She then stated that she was dragged from room-to-room by her hair; she was assaulted in each room. A.D. stated that she was hit in the head with a hammer. Morrison testified that he could see the imprint of the round hammer head on her forehead. Morrison further testified that A.D.'s hair was knotted and matted and that portions were pulled out but still clinging to the knots.

**{¶ 30}** As to the sexual assault, A.D. stated that appellant forced his penis into A.D.'s mouth. A.D. further stated that appellant had her bend over the couch and vaginally penetrated her against her will. A.D. stated that she did not know if appellant ejaculated or not prior to stopping. She got him a towel so he could clean up (she was menstruating at the time); he then fell asleep.

**{¶ 31}** Detective Morrison stated that on March 3, 2021, he went to A.D.'s home to collect evidence. He noted that the bruising to A.D. face and limbs had become very heavy, especially around her eyes. Morrison was also able to observe the "remnants" of the damage done to the apartment. Photographs taken by Morrison of A.D. and the

10.

apartment were admitted into evidence. He also collected towels used by appellant and A.D. to wipe up after the assault.

{¶ 32} Morrison stated that the items he collected that were sent to the BCI included appellant's buccal swab, the SANE kit, and the hammer. He indicated that the towels given to him by A.D. were not sent because they were limited in the number of items that could be submitted for testing. Detective Morrison stated that he made a later inquiry about the towels but that the BCI advised him that a DNA connection had already been made and that they would not take any additional items.

{¶ 33} Detective Morrison testified that after interviewing A.D. and reviewing the evidence he charged appellant with two counts of rape, for the oral and vaginal rapes, kidnapping, for the acts of forcing A.D. and dragging her throughout the house, felonious assault, based on the injuries A.D. sustained from the hammer, and resisting arrest and obstruction of justice due to appellant's actions when police attempted to get him into custody.

{¶ 34} Detective Morrison was questioned about his contact with A.D. over the course of the proceedings. He stated that early in the investigation they were in regular contact with each other and that on March 9, 2021, she appeared at the grand jury proceedings. Shortly thereafter, however, she ceased cooperating and would not return his phone calls. Morrison stated that this is common in domestic violence situations

11.

especially where the couple reconciles. He noted the constant contact appellant and A.D. maintained, despite a no contact order, which he believed impacted the proceedings.

{¶ 35} Morrison acknowledged A.D.'s recantation in May 2021; he indicated that it did not change the course of the investigation because it frequently occurs in cases of a domestic nature. He agreed that she did not try to recant any statements relating to her physical injuries. He also agreed that the recantation did not change the condition her apartment was found in on March 1, 2021, and that it did not change the results of the DNA testing.

{¶ 36} Detective Morrison testified that nine calls were placed to A.D. following the first day of trial and that he believed she and appellant were a couple. Morrison admitted that he was not sure if A.D. was ever subpoenaed to appear at trial because the attempts were returned as undeliverable. He stated that A.D., despite knowing that the trial was underway, had not made herself available to testify against appellant. The detective stated that evidence of her knowledge was based on the nine jail calls placed following the first day of trial.

{¶ 37} During cross-examination, Detective Morrison acknowledged that A.D. recanted her statements in May 2021 by sworn affidavit rather than just a letter or contradictory statement. Morrison stated that he did not attempt to talk with A.D. at this point because he had lost all contact with her in mid-March. Detective Morrison testified

12.

that during the course of the proceedings he checked the search engine LexisNexis for a possible new address to send victim witness letters.

{¶ 38} Detective Morrison was questioned about the DNA and physical evidence, including that there was neither vaginal trauma nor the presence of semen. He was also questioned about the fact that a potentially significant item of evidence, the towel appellant allegedly wiped himself off with after sex, was not submitted to the BCI. Morrison was further questioned about the fact that there was no photographic or physical evidence demonstrating that A.D. was dragged through the apartment by her hair.

{¶ 39} At the conclusion of the state's evidence, defense counsel made a Crim.R. 29 motion for acquittal arguing that there was no evidence that the rapes occurred "during a period of force" and that, generally, appellant should be acquitted of all six charges. The state contended that even with the SANE nurse testimony alone, there was sufficient evidence that A.D. was forcibly raped. The motion was denied. With the defense not presenting any evidence, the motion was renewed and again denied.

{¶ 40} The jury returned guilty verdicts as to all the charges. This appeal followed the February 22, 2022 sentencing.

13.

## II. Assignments of Error

I. The trial court abused its discretion by granting the state's motion for forfeiture by wrongdoing pursuant to Evid.R. 804(B)(6).

II. The trial court abused its discretion by denying Harvey's motion for acquittal as the charges of rape and kidnapping pursuant to Crim.R. 29, because appellant's convictions were not supported by sufficient evidence.

III. Appellant's convictions for rape and kidnapping were not supported by the manifest weight of the evidence.

## III. Discussion

### A. Evid.R. 804(B)(6) Forfeiture by Wrongdoing

{¶ 41} In appellant's first assignment of error he argues that the court abused its discretion when it granted the state's motion for forfeiture by wrongdoing pursuant to the hearsay exception under Evid.R. 804(B)(6). The state counters that, as demonstrated by the preponderance of the evidence, appellant's constant contact with A.D., in violation of the no contact order, and continual pleas to make the case go away, caused A.D. to be unavailable for trial.

{¶ 42} An accused's right to confront the witnesses against him or her, established in the Confrontation Clause of the Sixth Amendment and codified in the state and federal rules against hearsay, "both restrict the use of statements of a person not present at trial." *State v. Keairns*, 9 Ohio St.3d 228, 229, 460 N.E.2d 245 (1984). A trial court's hearsay

14.

rulings are generally reviewed for an abuse of discretion. *State v. Hymore*, 9 Ohio St.2d 122, 128, 224 N.E.2d 126 (1967). However, we review de novo evidentiary rulings that implicate the Confrontation Clause. *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, ¶ 97, citing *United States v. Henderson*, 626 F.3d 326, 333 (6th Cir.2010).

{¶ 43} Evid.R. 804 provides several exceptions to the rule against hearsay based on the unavailability of a witness. Relevantly, the rule provides:

(A) Definition of Unavailability. "Unavailability as a witness" includes any of the following situations in which the declarant:

* * *

(5) is absent from the hearing and the proponent of the declarant's statement has been unable to procure the declarant's attendance (or in the case of a hearsay exception under division (B)(2), (3), or (4) of this rule, the declarant's attendance or testimony) by process or other reasonable means.

A declarant is not unavailable as a witness if the declarant's exemption, refusal, claim of lack of memory, inability, or absence is due to the procurement or wrongdoing of the proponent of the declarant's statement for the purpose of preventing the witness from attending or testifying.

(B) Hearsay Exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

\* \* \*

(6) Forfeiture by Wrongdoing.  A statement offered against a party if the unavailability the witness is due to the wrongdoing of the party for the purpose of preventing the witness from attending or testifying.  However, a statement is not admissible under this rule unless the proponent has given to each adverse party advance written notice of an intention to introduce the statement sufficient to provide the adverse party a fair opportunity to contest the admissibility of the statement.

{¶ 44} Forfeiture by wrongdoing is a recognized equitable exception to a defendant's constitutional right to confront the witnesses against him.  *McKelton* at ¶ 96, citing *Giles v. California*, 554 U.S. 353, 366, 128 S.Ct. 2678, 171 L.Ed.2d 488 (2008); *Reynolds v. United States*, 98 U.S. 145, 158, 25 L.Ed. 244 (1878).  In 2001, the doctrine was codified as a hearsay exception under Evid.R. 804(B)(6).

To admit statements under this exception, a prosecutor must show by a preponderance of the evidence that (1) the defendant engaged in wrongdoing that caused the witness to be unavailable and (2) one purpose for the wrongdoing was to make the witness unavailable to testify.  *See*

> *State v. Fry*, 125 Ohio St.3d 163, 2010-Ohio-1017, 926 N.E.2d 1239, ¶ 106;
>
> *State v. Hand*, 107 Ohio St.3d 378, 2006-Ohio-18, 840 N.E.2d 151, ¶ 84.

*Id.*

{¶ 45} Interpreting the forfeiture by wrongdoing exception, the state urges us to apply the reasoning in a Third Appellate District case involving similar jail contacts between the victim and the defendant. *State v. Artis*, 2019-Ohio-2070, 137 N.E.3d 587 (3d. Dist.). In *Artis*, the defendant was charged with domestic violence. Approximately three weeks prior to trial, the state filed a motion for forfeiture by wrongdoing asking that the court declare the victim unavailable as a witness due to audio recordings of jail calls where the defendant repeatedly "suggested" that the victim not appear for trial. *Id.* at ¶ 4. At the start of trial, the state renewed its motion after confirmation that the victim was refusing to appear for trial. *Id.* at ¶ 5. Granting the motion, the court concluded that the state proved by a preponderance of the evidence that the defendant "colluded" with the victim to not respond to a properly-served subpoena. *Id.* at ¶ 6.

{¶ 46} Affirming the forfeiture by wrongdoing determination, the appellate court found clear evidence of wrongdoing based on the extensive conversations between appellant and the victim. *Id.* at ¶ 19-20. As to the victim's unavailability, the trial court recounted that after she failed to appear at trial as ordered in the subpoena, the court found her in contempt and directed the sheriff's office to locate her. *Id.* at ¶ 22. The victim was located over an hour away and still refused to comply with the subpoena. *Id.*

17.

at ¶ 23. The court concluded that the trial court's determination of unavailability was supported by the record. *Id.* at ¶ 29.

{¶ 47} This court has similarly held that the trial court properly granted a motion for forfeiture by wrongdoing where, after the victim had been properly subpoenaed and attempted to be reached at home and through family members, the court concluded that the appellant, by contacting the victim in violation of the no contact order and instructing others to make sure she did not appear at trial, caused her unavailability. *State v. Harper*, 2017-Ohio-1395, 89 N.E.3d 141 (6th Dist.). *See State v. Parker*, 6th Dist. Lucas No. L-18-1238, 2020-Ohio-4607, ¶ 88 (chronicling an extensive list of measures taken by the state in an attempt to secure the victim's presence at trial and then finding that the trial court did not err in granting the state's motion for forfeiture by wrongdoing); *State v. Gonzalez*, 6th Dist. Wood Nos. WD-19-068, WD-19-069, 2020-Ohio-4495 (after successful service of a subpoena, the victim's failure to appear was attributed to appellant's continued harassment and threats).

{¶ 48} The critical distinction between the above-cited cases and the case at bar is the trial court's proper finding that the state was unable to serve A.D. through process or other reasonable efforts. Illustrative, though not binding on this court, the Oregon Supreme Court had addressed witness unavailability where a subpoena was not served and the domestic violence victim had been repeatedly threatened and did not appear at trial. *State v. Iseli*, 458 P.3d 653 (Or.2020). The court noted that a defendant's conduct

18.

is, by definition "relevant" to the forfeiture by wrongdoing inquiry and not "irrelevant" to the broader unavailability inquiry. *Id.* at 665. The court noted that the "reasonable means" inquiry contemplates a totality of the circumstances approach, *id.*, and the reason for a declarant's nonattendance has bearing on the reasonable means to be employed in a particular case. *Id.* at 666. The court concluded that a determination of reasonableness of procuring a witness' attendance beyond service of a subpoena included the consideration of the costs of securing the witness' attendance, the importance of the testimony, and the likelihood that the additional efforts would produce the witness. *Id.* at 668. The court ultimately concluded that the state had failed to establish the victim's unavailability. *Id.* at 669-670.

{¶ 49} In the present case, the state does not dispute that A.D. was not served by subpoena. The record contains two unserved subpoenas dated November 23, 2021, and just before trial on January 11, 2022. Thus, because appellant was not served by process, we must consider what reasonable means were employed to secure her appearance. Even a cursory review of the record demonstrates that A.D. had several ties to the community. As evidenced in the 911 call, she had a sister who, on the date of the incident, lived just minutes away. In fact, her children were dropped off there prior to A.D. being transported to the hospital. Further, many of the records admitted into evidence had A.D.'s mother's name and local address listed. There was no evidence presented that the state contacted any family members to identify A.D.'s whereabouts. Though appellant,

19.

through coercive means, certainly worked to ensure that A.D. would not testify against him, this did not relieve the state of its obligation to secure her attendance at trial. Further, and concerning to this court, is the state's knowledge that A.D. had recanted several of the allegations in May 2021. Her contradictory testimony was anticipated as evidenced by the state's request that she be called as a court's witness. Certainly, the ability to present her statements through the testimony of responding officers would be easier and likely more convincing to the jury. We strongly caution against the use of such tactics.

{¶ 50} Looking at the totality of the circumstances, because the state failed to demonstrate its attempts to secure the presence of A.D., by subpoena or other reasonable means by a preponderance of the evidence, the court erred in concluding that appellant's actions *caused* A.D. to be absent from trial. Appellant's first assignment of error is well-taken.

### B. Sufficiency and manifest weight of the evidence

{¶ 51} In light of our disposition of appellant's first assignment of error, we review his second and third assignments of error excluding consideration of the evidence wrongfully admitted at trial to determine whether the verdicts are supported. *See State v. Harris*, 142 Ohio St.3d 211, 2015-Ohio-166, 28 N.E.3d 1256. Appellant raises these assignments of error specifically as to his convictions for rape and kidnapping.

*1. Sufficiency of the evidence*

{¶ 52} Sufficiency of the evidence is a question of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). Under this standard of adequacy, a court must consider whether the evidence was sufficient to support the conviction as a matter of law. *Id.* The proper analysis is "'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Williams*, 74 Ohio St.3d 569, 576, 660 N.E.2d 724 (1996), quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶ 53} Appellant was convicted of two counts of rape, R.C. 2907.02(A)(2) and (B), which provides, in relevant part:

> (2) No person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force.

> (B) Whoever violates this section is guilty of rape, a felony of the first degree.

{¶ 54} Appellant was also convicted of kidnapping, R.C. 2905.01(A)(4) and (C), which provides:

> (A) No person, by force, threat, or deception, or, in the case of a victim under the age of thirteen or mentally incompetent, by any means,

21.

shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes:

* * *

(4) To engage in sexual activity, as defined in section 2907.01 of the Revised Code, with the victim against the victim's will;

* * *

(C)(1) Whoever violates this section is guilty of kidnapping. Except as otherwise provided in this division or division (C)(2) or (3) of this section, kidnapping is a felony of the first degree.

{¶ 55} Evidence supporting the rape convictions is as follows. At trial, the testimony of the SANE nurse began with a detailed recitation of her training and qualifications. The nurse explained that the purpose of a history taken from a victim is to guide the course of the physical examination. The history was written by the nurse and typed into A.D.'s electronic medical records. The records were admitted into evidence over defense counsel's continuing hearsay objection.

{¶ 56} The SANE nurse then read the history. A large portion of the narrative detailed the physical injuries sustained by appellant and property damage leading up to the sexual assault. Appellant does not dispute the felonious assault conviction on appeal. As to the rapes, the nurse read:

22.

[Y]ou got to suck my dick and make me feel better * * * he was trying to shove himself into my mouth. * * *. Then he was trying to force me to lay down and he said, after this I just want – or, I want some of that pussy. I said, no, because I'm on my period. He said I don't care and he threw me against the couch and pulled my pants down.

{¶ 57} We note that A.D.'s medical records were properly admitted under Evid.R. 702, and that statements made for the purpose of diagnosis and treatment may be admissible under Evid.R. 803(4), which provides that statements are not hearsay when "made for purposes of medical diagnosis or treatment and describ[e] medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." "For statements to be admissible under this exception, the declarant's motive must be consistent with that of a patient seeking treatment and it must be reasonable for the medical provider to rely on the information in diagnosing and treating the declarant." *State v. Holmes*, 6th Dist. Lucas No. L-17-1111, 2019-Ohio-896, ¶ 77, citing *State v. Ridley*, 6th Dist. Lucas No. L-10-1314, 2013-Ohio-1268, ¶ 49. We have previously found that a description of the injuring event falls within the medical diagnosis or treatment hearsay exception. *Holmes* at ¶ 77, citing *Ridley* at ¶ 52.

{¶ 58} In addition, testimony from the BCI forensic scientist that appellant's DNA was found on the back panel of appellant's underwear and on the swabs from her cheek.

{¶ 59} As to the kidnapping conviction, Detective Morrison noted his observation that consistent with being dragged, appellant's hair had been pulled out and was hanging in knots. Further, during her SANE examination, A.D. detailed that she and appellant moved from room to room with appellant physically assaulting her in each room. A.D. stated that she was forced to sit in her bedroom while appellant poured a case of bottles water on her, bottle by bottle. According to the SANE report and nurse testimony, the events culminated in appellant forcibly removing A.D.'s clothing, shoving himself in her mouth, and forcing her to lay down for the purpose of forced vaginal sex.

{¶ 60} Based on the foregoing, we find that appellant's rape and kidnapping convictions were supported by sufficient evidence. Appellant's second assignment of error is not well-taken.

*2. Manifest weight of the evidence*

{¶ 61} Appellant's third assignment of error asserts that his convictions for rape and kidnapping were against the manifest weight of the evidence. Unlike sufficiency of the evidence, when reviewing a manifest weight claim,

> "[t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a

24.

new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction."

*State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 220, quoting *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541.

{¶ 62} Reviewing all the admissible testimony and evidence presented at trial, we cannot say that the jury lost its way in finding appellant guilty of two counts of rape. As detailed above A.D., while being medically treated, stated that appellant forced his penis in her mouth and in her vagina. DNA evidence supported these claims. Testimony regarding A.D.'s affidavit recanting the rapes was also presented to the jury. As to kidnapping, evidence was presented that A.D. had been dragged by her hair, had been assaulted in various rooms in the apartment and was not allowed to leave, and was forced to engage in oral and vaginal sex. Thus, we conclude that the rape and kidnapping convictions were not against the manifest weight of the evidence. Appellant's third assignment of error is not well-taken.

## IV. Conclusion

{¶ 63} Although we find that the trial court erred in finding that A.D. was unavailable for trial and that her hearsay statements to law enforcement were admissible,

the remaining, admissible evidence supported the jury's verdict. Accordingly, we affirm

the February 7, 2022 judgment of the Lucas County Court of Common Pleas. Pursuant to

App.R. 24, costs are assessed to appellant.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27.
*See also* 6th Dist.Loc.App.R. 4.


Mark L. Pietrykowski, J. _____

_____
                                          JUDGE

Gene A. Zmuda, J. _____

_____
Myron C. Duhart, P.J. _____                JUDGE
CONCUR.

_____
                                          JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions. Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.