[Cite as *State v. Pecina*, 2025-Ohio-1952.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                                  Court of Appeals No.  L-23-1261

      Appellee                                           Trial Court No.  CR0202202784

v.

Andres Pecina                                          **DECISION AND JUDGMENT**

      Appellant                                          Decided:  May 30, 2025

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Lorrie J. Rendle, Assistant Prosecuting Attorney, for appellee.

Dan M. Weiss, for appellant.

* * * * *

**SULEK, P.J.**

{¶ 1} Appellant, Andres Pecina, appeals from the October 18, 2023 judgment of

the Lucas County Court of Common Pleas convicting him of one count of aggravated

murder, one count of aggravated burglary, two counts of murder, one count of felonious

assault, and one count of domestic violence.  Pecina raises three assignments of error: he

challenges the trial court's failure to sever his charge for domestic violence from his trial

for the remaining counts in the indictment; he asserts that the trial court erroneously

admitted hearsay statements that violated his rights of confrontation and due process; and

as to all counts other than domestic violence, Pecina challenges the sufficiency of the evidence to support a finding of guilty and contends his conviction was against the manifest weight of the evidence. For the reasons that follow, the trial court's judgment is affirmed.

## I. Facts and Procedural History

{¶ 2} On August 27, 2022, E.C. called 911 to report that Pecina, her boyfriend, had "stomped her head in," pushed her into a mirror, and broke her bedroom window. She also said he had a gun. She told the operator that she planned to press charges against Pecina.

{¶ 3} When police first arrived on scene at the home where E.C. lived with her uncle, E.C. was in her bedroom with the door shut and did not respond to police. While the police were searching the house and surrounding area, a distraught E.C. came out of her bedroom and gave the police further details about Pecina's actions that night. She said she had never pressed charges against Pecina in the past because he threatened to kill her. This conversation as well as the search for Pecina—whom the police did not locate that night—was recorded on a police body-worn camera.

{¶ 4} Two days later, on August 29, 2022, E.C. was dead. On the afternoon of her death, E.C.'s father entered E.C.'s residence and found Pecina with an unresponsive E.C. Pecina claimed that E.C. had hung herself. E.C.'s father called 911, but first responders were unable to revive E.C. Pecina told police that he had found E.C., with whom he had been alone in the house, hanging from a ceiling fan with an extension cord tied around her neck.

2.

{¶ 5} On October 20, 2022, the Lucas County Grand Jury indicted Pecina on one count of aggravated murder in violation of R.C. 2903.01(B) and (G), an unclassified offense (count 1); one count of aggravated burglary in violation of R.C. 2911.11(A)(1) and (B), a first-degree felony (count 2); one count of murder in violation of R.C. 2903.02(A) and 2929.02, an unclassified offense (count 3); one count of murder in violation of R.C. 2903.02(B) and 2929.02, an unclassified offense (count 4); one count of felonious assault in violation of R.C. 2903.11(A)(1) and (D), a second-degree felony (count 5); and one count of domestic violence in violation of R.C. 2929.25(A), (D)(1) and (D)(2), a first-degree misdemeanor (count 6). Counts 1 through 5 stemmed from the events of August 29, 2022, and count 6 arose from the incident that took place on August 27, 2022.

## A. Pretrial Motions

{¶ 6} Pecina pleaded not guilty to the charges, and he filed several pre-trial motions, including a motion to sever and multiple motions in limine.

### *Pecina's Motion to Sever*

{¶ 7} In his motion to sever, Pecina sought to have count 6 of the indictment, the domestic violence charge arising out of the events of August 27, 2022, tried separately from the remaining charges in counts 1 through 5, all of which related to the events surrounding E.C.'s death on August 29, 2022. Pecina alleged that the charges were misjoined because the offenses were not of the same character, resulted from unrelated events, and were not continuing criminal conduct.

3.

{¶ 8} Next, pursuant to Crim.R. 14, Pecina argued that the court should sever count 6 from the remaining counts because trying all the offenses together would be prejudicial. He claimed that the evidence relating to count 6 would be inadmissible under Evid.R. 404(B) in a trial of counts 1 through 5. Pecina contended that the state planned to use the evidence regarding the domestic violence offense for propensity purposes, and he asserted there was not substantial proof that he committed domestic violence because E.C.'s injuries did not reflect her allegations and she was "uncooperative and disinterested" when she spoke with police. In response, the state argued that the evidence of each offense was simple and direct without significant overlap or conflation of proof.

{¶ 9} The trial court denied Pecina's motion to sever, finding that "the evidence of domestic violence is simple and direct and that a jury would be capable of segregating the evidence of the two crimes." In addition, the trial court held that evidence regarding the domestic violence offense would be admissible in a trial of the other offenses under Evid.R. 404(B) as evidence of a scheme or plan. The trial court explained, "[t]he altercation and incidents [on August 27, 2022 and August 29, 2022 between Pecina and E.C.] were related and it would be difficult to present the evidence of [E.C.'s] murder without first presenting evidence of how the altercation began with domestic violence."

### Pecina's Motions in Limine

{¶ 10} Among Pecina's motions in limine was a motion to exclude E.C.'s statements to police on August 27, 2022, which were recorded with a police body-worn camera ("body cam"). Pecina contended that the statements were inadmissible hearsay, the admission of which would violate his right to confrontation. Just before trial, the trial

4.

court ruled that E.C.'s statements on the body cam video were admissible. The court reasoned that some of the statements constituted nontestimonial statements made during an ongoing emergency, but the court also opined that at some point during the encounter, the statements became testimonial in nature. The court held, however, that all of the statements—even the testimonial ones—were admissible under the forfeiture-by-wrongdoing exception to the rule against hearsay and the Confrontation Clause. Citing *State v. McKelton*, 2016-Ohio-5735, and *Giles v. California*, 554 U.S. 353 (2008), the trial court determined that there was sufficient evidence of prior domestic violence through E.C.'s statements to police, and therefore Pecina's intent to prevent E.C.'s testimony could be inferred in such circumstances.

## B. Trial Proceedings

{¶ 11} At the jury trial, which spanned four days, the state presented the testimony of several witnesses, including E.C.'s father, several members of the Toledo Police Department, the Lucas County Coroner, and others. Pecina did not testify on his own behalf, but he did present the testimony of an expert witness regarding the manner of E.C.'s death. The testimony and evidence presented at trial is summarized below.

### E.C.'s 911 Call on August 27, 2022

{¶ 12} Toledo Police Officer Philip Cook testified in conjunction with a recording of the 911 call E.C. made on the night of August 27, 2022. During the call, E.C. told the 911 operator that Pecina hurt her, identifying Pecina by his full name. She said that Pecina "just stomped [her] head in … with his shoes," "he pushed [her] in the mirror," and Pecina had broken her bedroom window. E.C. reported she had "marks all over [her]

5.

face." Pecina still seemed to be on scene at the time E.C. was making the call—E.C. was speaking to someone else during the call, and she told the operator, "he's pushing me now, he's got a gun." E.C. said that Pecina "was supposed to be gone days ago." E.C. denied needing medical treatment, but she told the operator she wanted to press charges against Pecina.

### Police Response to E.C.'s 911 Call

{¶ 13} Toledo Police Officer John Grunden and his partner, Officer Juan Travino, responded to E.C.'s 911 call on August 27, 2022. Grunden's body cam recorded his movements and conversations that evening, and Grunden testified in conjunction with the video.

{¶ 14} When Grunden arrived at the residence where E.C. lived with her uncle, Eric Cole, Grunden observed Eric alone in the living room. Eric answered the door and led police to the rear of the house, where E.C.'s bedroom was located directly off the kitchen. E.C. did not answer when police knocked on her bedroom door.

{¶ 15} Officers Grunden and Travino began looking around, both indoors and outdoors. While outdoors, they observed a broken window in the rear of the house corresponding to the location of E.C.'s bedroom. Broken glass was on the ground beneath the window. The officers continued to look outside for a short time before going back into the house, where they discovered that E.C. had emerged from her bedroom and was lying on the kitchen floor, crying and holding her face. While Officer Travino spoke to E.C., Grunden alternated between continuing to look for Pecina in the house and

6.

observing their conversation, much of which was captured by Officer Grunden's body cam.

{¶ 16} To Officer Travino, E.C. repeated many of the same allegations regarding Pecina's actions that night as in her 911 call. She said that Pecina had "stomped" on her head and pushed her into the bathroom mirror. E.C. also said that Pecina had threatened to kill her. When asked if she had filed charges on Pecina in the past, E.C. said she had not "because [Pecina] said he'd kill me." Officer Grunden testified that he personally observed reddening on E.C.'s face, and he explained that in his experience bruising often takes time to develop.

{¶ 17} E.C. reiterated to the officers that she wanted to press charges against Pecina this time. After his encounter with E.C., Officer Grunden filed the paperwork for warrants for Pecina's arrest for domestic violence and assault.

### Todd Cole's 911 Call on August 29, 2022

{¶ 18} On August 29, 2022, at approximately 4:39 p.m., Todd Cole called 911 to report that his daughter, E.C., was unresponsive. Toledo Police Officer Cook testified in conjunction with a recording of this 911 call as well.

{¶ 19} During the call, Todd told the operator, "My daughter, I guess, I just got here, she tried to, she tried to hang herself so she ain't breathing." The operator asked if she was down, and Todd replied, "Yeah, she's down." In the recording, Todd can be heard speaking to someone else in the room with him, asking the other person if E.C. was breathing, and then instructing the other person to "lay her down" when the person said E.C. was not breathing. Todd is then heard asking the other person, "Was she hanging?"

7.

### *Todd Cole's Testimony*

**{¶ 20}** Todd testified E.C. and Pecina did not have a good relationship, and there was frequent conflict between them. In the days before E.C.'s death, she appeared "beat up," with bruises on her face and arms. Nonetheless, Todd—who saw E.C. just a few hours before she died—characterized E.C. as upbeat, happy, and very hopeful. He said that E.C. had enrolled in school and finally decided to move on from her relationship with Pecina.

**{¶ 21}** On the afternoon of E.C.'s death, Todd went to the house where his brother, Eric, and E.C. lived together at around 2:00 p.m. Todd spoke with E.C. for approximately 20 minutes, and E.C. talked about how excited she was to go back to school and move on with her life. Todd said E.C. was initially crying during their conversation as she discussed her relationship with Pecina, but he characterized her tears as "happy" as she talked about her future plans. This conversation occurred in the kitchen, which was next to E.C.'s bedroom. Todd testified that he believed that the door to E.C.'s bedroom—which opened directly into the kitchen—was partially open during their conversation. After talking with E.C., Todd left with Eric to visit a relative, leaving E.C. at the house. Todd believed that E.C. was alone in the house when he left.

**{¶ 22}** About two hours later, at around 4:00 p.m., Todd and Eric returned to E.C.'s house. Todd testified that as he approached the house, he heard Pecina yelling E.C.'s name. Todd said he was very upset when he heard Pecina in the house because he believed that Pecina beat up E.C. a few days before, and he started yelling that he was going to kill Pecina before entering the house. When he came in the side door, he saw

8.

E.C. lying flat on the floor in the dining room. E.C.'s head was near the doorway to the kitchen and her feet pointed toward the front of the house. Todd saw Pecina next to E.C., and Pecina continued calling E.C.'s name. Todd immediately ran to E.C., and he noticed that E.C.'s body was no longer warm.

{¶ 23} Todd asked Pecina if he had called 911. Because Pecina said he had not, Todd called 911. Pecina then told Todd that E.C. hung herself. Todd did not remember telling the 911 operator that E.C. had hung herself. Instead, Todd said that he never believed Pecina's story about E.C. hanging herself.

{¶ 24} Indeed, Todd testified that he never saw E.C. hanging, and he denied that he helped Pecina untie E.C. or otherwise assisted in moving E.C. Instead, Todd maintained that E.C. was already lying flat on the ground when he and Eric entered the residence. Todd also observed a thick extension cord hanging on the dining room's ceiling fan, draped over the portion of the fan connecting one of the fan's blades to the central fan mechanism. E.C.'s feet were under the cord, and Todd did not see any knots in the cord. Finally, Todd testified that in the more than 30 years that his family had owned the home, he could not recall the ceiling fan ever being replaced.

### Police Response to 911 Call on August 29, 2022

{¶ 25} Toledo Police Officer Timonthy Langlois was one of the first officers who responded to Todd's 911 call that afternoon. Langlois was wearing a body cam, and Langlois testified in conjunction with the video from his body cam.

{¶ 26} When Langlois entered the residence, he saw E.C. lying on the floor on her back with an extension cord hanging from a fan blade with the ends of the cord by E.C.'s

9.

feet. Langlois testified that the cord was not tied to the fan, and it was not affixed to E.C. in any way. Langlois attempted to do chest compressions, but Langlois was never able to find a pulse.

{¶ 27} Langlois testified that he briefly spoke to Pecina. During the conversation, Pecina said he had arrived at the house and found E.C. approximately 20 minutes before the police did.

{¶ 28} Next, Toledo Police Officer Tyler Glass testified that he also responded to the 911 call that afternoon. Glass was also wearing a body cam, and the footage from his body cam was admitted. Like Langlois and Todd Cole, upon entering the home, Glass saw an extension cord hanging in an upside down U shape, without any visible knots, from a ceiling fan blade in the dining room. And as Glass entered the house, Todd Cole is heard telling police that he and his brother were the last people at the house with E.C., but they had been gone for a couple of hours.

{¶ 29} After first responders ceased their efforts to revive E.C., Glass exited through the house's front door and walked to a side porch, where he met Pecina, who had just been standing in the doorway between the kitchen and the dining room. Todd and Eric Cole were still inside the house speaking with other police officers when Glass exited the house, and no one besides other police officers came near the side porch during Glass's interaction with Pecina. Pecina told Glass that he and E.C. had been in a relationship for approximately a year and a half and he had been living with E.C. at her uncle's house, though they had been having issues in their relationship. Pecina said that

10.

E.C. was a drug user, was intermittently suicidal during their relationship, and had been having trouble with her family.

{¶ 30} Consistent with what he said to Langlois, Pecina told Glass that he found E.C. hanging approximately 20 minutes before police arrived, at around 4:20 p.m. Before then, Pecina said that he had not seen or otherwise had any contact with E.C. since sometime in the five o'clock hour early that morning, when he left the house for the day. Pecina explained that he and E.C. had been arguing and going through relationship issues, so he had come back to the house that afternoon to get some clothes and see if they could work things out.

{¶ 31} Pecina said that when he returned to the house at around 4:20 p.m., E.C. was hunched over a chair at the dining room table with an extension cord around her neck. In Glass's body cam video, Pecina demonstrated E.C.'s position when he found her, hunching his shoulders forward and angling his head toward his right shoulder. Pecina told police that he lifted E.C., who weighed approximately 40 pounds more than Pecina, from behind when he found her. Pecina said he was in the process of "unwrapping" E.C. when Todd Cole came into the house.

{¶ 32} Finally, Seargeant Gary Michalski of the Toledo Police Department testified that he also went to the Cole residence in response to the 911 call. He briefly spoke to Pecina while at the scene, and Pecina told him that he arrived at the house 20 minutes before the police did and discovered E.C. hanging. Detective Michalski said that neither E.C.'s dad nor her uncle was nearby when he spoke to Pecina at the scene.

11.

**{¶ 33}** Michalski also spoke to Todd Cole.  Michalski testified that Todd said that E.C. had been depressed, upset, and crying earlier that day.  While at the house, Michalski also noticed that a diary in E.C.'s bedroom was opened to a page dated for that day.  Michalski said it appeared to be a will written by Pecina.  This document, which was admitted later in the trial, was signed by Pecina and directed that in the event of Pecina's death, E.C. should receive certain items of Pecina's personal property, stating that "[t]he reason for this is I owe her money and she is the love of my life."

**{¶ 34}** Other police officers who were on the scene that day also testified about the ceiling fan.  One of them, Javier Ramirez, a crime scene investigator, noted that the ceiling fan appeared loose and the fan blades were covered in thick, undisturbed dust.

### Pecina's First Interview

**{¶ 35}** Pecina agreed to a police interview at police headquarters on the evening of August 29, 2022.  Seargeant Gary Michalski of the Toledo Police Department conducted the interview, and he testified in conjunction with a video of the interview.

**{¶ 36}** Pecina provided additional information about the events leading up to E.C.'s death.  He and E.C. had been fighting, so Pecina stayed at his cousin's house the night before E.C.'s death.  Pecina said that at around 5:00 a.m., Pecina called E.C. from his cousin's phone, and then E.C. called him back.  Pecina said after that call, he met E.C. about halfway between E.C.'s house and his cousin's house, and the two of them walked back to the house where E.C. lived with her uncle.

**{¶ 37}** Contrary to what Pecina had told Michalski, Glass, and Langlois earlier, Pecina said that he had been at E.C.'s house the entire day, claiming that early that

12.

morning E.C. had snuck him into her bedroom, where he was still hiding when she hung herself. Pecina explained that E.C.'s dad and uncle did not want Pecina to be at E.C.'s house and the police were looking for Pecina due to the August 27th incident. Pecina thought E.C.'s uncle Eric would call the police if Eric knew Pecina was in the house, so he hid in E.C.'s bedroom where Eric would not find him.

{¶ 38} Pecina said that after arriving at the house that morning, he and E.C. reconciled and had consensual sex. Sometime that morning, a man named Jeremy Fye came into the house with E.C.'s uncle, and the two of them left to get pizza. According to Pecina, E.C. saw her uncle leaving with Fye and was upset. For the previous few weeks, Fye, whom Pecina characterized as a "weirdo," had been giving E.C. rides to places because she did not have a vehicle, and that was one of the reasons why E.C. and Pecina had fought a few days before. After seeing Fye leave with her uncle, E.C. told Pecina that Fye had been hanging out at the house for the previous few days—Pecina said that E.C. and Fye were getting high together in E.C.'s bedroom—and Fye had tried to "put his hands on her" and "pimp her out."

{¶ 39} While E.C.'s uncle and Fye were getting pizza, Pecina came out of E.C.'s room. Pecina said he had not showered in three days because he had nowhere to go during that time, so E.C. told him to take a shower. While Pecina took a quick shower, E.C. made him food, which Pecina ate in E.C.'s bedroom.

{¶ 40} E.C.'s uncle and Fye returned shortly after E.C. finished making food for Pecina, and Pecina said E.C. argued with her uncle and Fye in the kitchen. According to Pecina, who said that he could hear the argument well from his hiding place in E.C.'s

13.

bedroom, E.C. yelled at her uncle for letting Fye into the house. E.C. told her uncle that Fye was trying to get money from him, to get Fye out of the house, and that she did not want Fye in the house anymore. During the argument, E.C. threw keys at her uncle. Pecina claimed that E.C.'s uncle was planning to make Fye a key for the house. E.C. later told Pecina that she had to push Fye out of the house. Pecina said that after Fye left, E.C.'s uncle remained at the house.

{¶ 41} Pecina and E.C. laid down in bed together and discussed E.C.'s plans to make some money by selling some items she listed on Facebook, and E.C. and Pecina intended to take a bus to meet the buyer. They took a nap, and then they heard a knock on the door. E.C. looked out her bedroom window and saw her dad's truck.

{¶ 42} Pecina hid again, and E.C. left the room to talk to her dad. Pecina reported that he could hear E.C. yelling at her dad. Pecina overheard E.C. and her dad yelling about E.C. throwing keys at her uncle. Pecina said other than the statements about E.C. throwing keys at her uncle, he could not hear what was said and he did not know how long they argued or even talked. Pecina said he was just trying to stay quiet and hide under the covers, but he did not know when E.C.'s dad left and he did not hear his truck start up or leave. He could not hear much of what was going on outside of E.C.'s bedroom because the television was on at a loud volume, but later in the interview, Pecina said that it was silent. Pecina also stated that the cell phone that E.C. let him use was next to him throughout that period, but he did not try to text or otherwise contact E.C. while he was hiding. He could not remember for sure whether E.C. had her other cell phone with her or whether it was still in her bedroom.

14.

{¶ 43} Pecina continued to hide for somewhere between an hour and a half to three hours, falling asleep for some time, before he got tired of hiding and had to go the bathroom.  Pecina looked out of E.C.'s bedroom window and saw that her dad's truck was gone, so he came out of her bedroom.  Later in the interview, when asked why Pecina had not checked if her dad's truck was gone earlier, Pecina explained that if her uncle's car was still there then he would have still had to hide.

{¶ 44} Pecina reported that as soon as he opened the bedroom door, he saw E.C. hanging from the dining room ceiling fan.  In the video of the interview, Pecina is seen demonstrating the position of E.C.'s body as he claimed he found her.  Pecina leaned forward far in his chair, and unlike in his demonstration to Officer Glass earlier that day, he hung his head forward with his chin near his chest.  Shortly after that, Pecina again demonstrated E.C.'s position, again leaning forward with his hips at the front edge of the chair seat and his knees near the ground under the chair, but this time Pecina tipped his head back towards his back with his chin facing upwards.

{¶ 45} Pecina said that E.C. was purple when he found her, and he claimed he immediately tried to get her down by lifting her up and untying her at the same time.  He said that a black extension cord was tied around her neck, gesturing to show that it was looped around the back of her neck.  Pecina said that E.C. had tied it "crazy" with about seven different tight knots in the cord that were hard to untie.  He also demonstrated his own movements in trying to untie E.C. and get her down.  In doing so, Pecina stood up, gestured with his left arm as if he were wrapping it around E.C. to support her body, then reached above his head with his right arm, using his right hand to show how he had to

untie a knot in the cord above his head. He also said he did not touch or pay attention to the part of the cord connected to the fan because he was only concerned about the part of the cord around E.C.'s neck.

{¶ 46} Pecina said that as he was getting E.C. down, about five minutes after Pecina discovered E.C. hanging, her dad walked into the house. Pecina said her dad helped him to untie E.C. and lower her to the ground as the 911 operator instructed them what to do. Pecina denied that E.C. was already lying on the ground when E.C.'s dad came in.

{¶ 47} When Michalski questioned Pecina about scratches on his arms and other marks on his body, including a mark on his lower leg and another one on his torso, Pecina said that they were not fresh marks. Instead, he claimed they were the result of E.C. hitting him on August 27. Pecina said that he had kicked E.C. that night, but he only did so to get her away from him because she was "nuts" and used pepper spray on him.

{¶ 48} Michalski asked Pecina about the diary entry about leaving his belongings to E.C. when he died. Pecina said he did that to make E.C. happy because she was upset that Pecina owed her money and he had not been able to repay her. Pecina explained that he was unemployed and he usually cut the grass for E.C.'s uncle to make money.

{¶ 49} Detective Michalski also asked Pecina about his phone number. Pecina clarified that it was the number for a cell phone that belonged to E.C. He explained that E.C. had two phones and E.C. let Pecina use one of them unless they were arguing, and then E.C. took it back. Pecina said he did not have his own phone, so he only had a

16.

phone when E.C. let him use her second phone. Pecina said that E.C. had given him the phone back at around 1:00 p.m. that day so he could call his mother.

{¶ 50} Throughout the interview, Pecina repeatedly denied knowing why E.C. would have committed suicide, saying that E.C. was happy on the day she died. He maintained that they did not argue or fight whatsoever that day, even though he was upset about her hanging around with Fye for the previous few days while he was gone. Pecina explained that he was glad that E.C. had told her uncle not to let Fye come around anymore.

{¶ 51} However, Pecina also claimed that E.C. "always" made statements about wanting to hurt herself and she was depressed about the death of her ex-boyfriend. And near the end of the interview, after police asked whether Fye or E.C.'s father or uncle could have had something to do with her death, Pecina said that he knew that E.C. did it. He said that she was always talking about hanging herself, and she had tried it once before in the garage and afterwards he hid the rope she used.

### Autopsy and Police Investigation

{¶ 52} Deborah Hahn, a death investigator for the Lucas County Coroner's office, testified about her investigation of E.C.'s death. She had previously investigated over 100 deaths, 15 of which had been hanging deaths. In her investigations of each of those 15 deaths, she had observed marks on the decedent in a location where the cord had caught onto part of the victim's body that prevented the cord from slipping off. She did not testify about such marks on E.C.'s body, but she observed ligature furrow marks underneath E.C.'s chin along her cheek and in front of her ear along her temple. She also

17.

observed bruising on E.C.'s left middle fingers as well as lividity in a pattern showing that E.C. had been lying on the floor on her back.

{¶ 53} As part of her investigation, Hahn went to E.C.'s home on August 29, the evening of E.C.'s death. There, among other things, Hahn observed that the ceiling fan was intact and hanging straight and was not skewed in any way. Hahn also examined the extension cord, observing that the cord appeared to be new with no knots in it. E.C.'s uncle told her that he had never seen the cord in his house before.

{¶ 54} The Lucas County Coroner, Dr. Diane Scala-Barnett, also testified. She was qualified as an expert witness based on many factors, including her experience performing over 15,000 autopsies in the coroner's office for a period of more than 30 years. Dr. Scala-Barnett conducted an autopsy of E.C. on August 30, 2022, and she prepared a report concerning her findings, which was admitted. In her report and in her testimony, Dr. Scala-Barnett noted that E.C. had injuries on her fingers, under her hair in her scalp, and bruising around her eye that had been covered with makeup. In addition, toxicology results revealed that E.C. had a toxic level of fentanyl in her blood as well as cocaine and alcohol.

{¶ 55} Dr. Scala-Barnett also testified that E.C. had two ligature furrow marks. One ligature mark was horizontal, encircling E.C.'s neck completely at the same level and did not angle upward. The second ligature furrow mark angled diagonally upward, overlapping with the first ligature mark. The horizontal ligature furrow mark was deeper than the angled ligature mark. The extension cord that had been hanging from the ceiling fan was consistent with the ligature marks on E.C. Dr. Scala-Barnett tried to tie the

18.

extension cord into a knot but was unable to do so because the cord was "very rigid." Based on her autopsy findings, Dr. Scala-Barnett concluded to a reasonable degree of scientific certainty that E.C. died of ligature strangulation and ruled E.C.'s death a homicide.

{¶ 56} Deidre Nachtigall, a forensic scientist with the Ohio Bureau of Investigation, testified about DNA evidence. First, she testified that DNA matching Pecina's DNA profile was found in a sample from E.C.'s vagina. She also testified that DNA was found on the outlet end of the extension cord, including DNA matching E.C.'s DNA profile and Pecina's DNA profile, as well as DNA from at least one other contributor. Blood found under E.C.'s fingernails on her right hand contained DNA matching E.C. as well as the DNA of a male person, though Natchigall said that there was insufficient DNA to compare it to the DNA of any individual; therefore she could not include or exclude Pecina as the contributor of that DNA.

{¶ 57} Danielle Mooney, a detective with the Toledo Police Department's crimes against persons unit, also testified that she investigated E.C.'s death. She noted that initially on August 30, 2022, E.C.'s death was considered a suicide by hanging, but after a discussion with the coroner, she determined that further investigation was warranted. Accordingly, Detective Mooney returned to E.C.'s home with a search warrant.

{¶ 58} While there, she reviewed security camera footage from a neighbor. The neighbor's home was situated on the other side of an alley that ran between E.C.'s home and the neighbor's home. Instead of a driveway, E.C.'s house had parking spots in its side yard directly off from the alley. The neighbor's security cameras, which were

19.

motion activated and recorded only short segments, pointed toward the parking area outside E.C.'s house and provided a view of the alley, the parking spots, and E.C.'s side porch and door.

{¶ 59} Video from the neighbor's security cameras, which was admitted at trial, showed the following sequence of events on August 29, 2022. A vehicle that was later identified as belonging to Jeremy Fye left E.C.'s residence at 3:23 a.m. Next, Eric Cole is seen leaving in his vehicle with a passenger, later identified as Fye, at 11:44 a.m. Eric's vehicle returned at 1:00 p.m. As the vehicle drove up the alley, E.C. was walking on the side porch, and she entered the house through the side door as the vehicle parked. Fye was not seen again. Todd Cole's truck arrived in the parking area at 1:59 p.m., left at 2:09 p.m. with a passenger, and returned at 4:36 p.m. Todd and Eric are seen getting out of the truck and entering the home through the side door. Finally, police are seen arriving at 4:44 p.m. At no point is Pecina visible in the security camera footage.

{¶ 60} Detective Mooney also arranged to have Ken Fisher, the Lucas County commissioner of building inspection, remove and examine the dining room ceiling fan. Fisher testified about his examination. First, he observed that the fan was approximately 8 feet from the ground and improperly installed. When Fisher removed the fan, he discovered that instead of being attached with machine screws to a ceiling box to a joist in the ceiling, which would have made the fan secure, a bracket in the fan was attached with drywall screws to a thin lath in the ceiling. Fisher also noted that the bracket was not solid even after it was removed. Fisher characterized the fan as "flimsy."

20.

{¶ 61} Finally, Detective Mooney obtained phone records for E.C.'s primary phone as well as the phone that E.C. let Pecina use. Detective Mooney confirmed that Pecina had used his cousin's phone to call E.C.'s primary phone at approximately 5:00 a.m. on the morning of E.C.'s death.

*Pecina's Second Interview*

{¶ 62} Detective Mooney then brought Pecina in for a second interview, the video of which was admitted at trial. In the second interview, conducted on August 30, 2022, Pecina repeated his chronology of events preceding E.C.'s death, and they were largely consistent with what Pecina told Detective Glass in his interview the day before.

{¶ 63} In the second interview, however, Pecina gave contradictory details about the manner in which E.C. was hanging when he found her. First, although he told Detective Michalski that there were seven knots in the cord, Pecina told Detective Mooney that there were at least two knots and possibly three knots in the cord.

{¶ 64} Next, he again changed his description of E.C.'s position. In his interview with Detective Michalski, Pecina initially demonstrated E.C.'s position by tilting his head forward, then in that same interview, he tipped his head back so his neck faced the ceiling. In his interview with Detective Mooney, Pecina again tilted his head far back with his neck facing the ceiling and the back of his head close to his back. Pecina said that E.C.'s rear end was hovering above the chair. However, after Detective Mooney showed Pecina autopsy photos of the ligature marks on the back of E.C.'s neck, Pecina changed how he positioned himself in demonstrating what E.C. looked like. This time, Pecina stood up and slumped his body forward with his chin near his chest to show how

21.

E.C. was hanging. Pecina also added a new detail that he had not previously told police—he claimed that the cord was wrapped around E.C.'s neck more than once.

{¶ 65} Pecina repeatedly maintained that he and E.C. did not argue on the day of her death, professed his love for E.C., and referred to E.C. as his wife. Pecina also admitted that he owed E.C. over $1000.

### Other Witness Testimony

{¶ 66} The state also presented the testimony of Racquel Becerra and Jeremy Fye. Becerra testified that she was E.C.'s friend, and she last saw E.C. approximately two days before E.C.'s death. Becerra said that on that day, E.C. had a big bruise on her forehead and bruises on her legs and head. E.C. told Becerra that she was leaving Pecina and moving forward with her life. E.C. planned to get her own house or apartment—rather than continuing to live with her uncle— so she could live alone and get her life back together.

{¶ 67} Fye also testified that he saw E.C. He said that he had been acquaintances with E.C. and Pecina, whom he knew as a couple, before E.C. and Pecina's argument on August 27, 2022. In the following days, E.C. and Fye spent some time together. Fye helped put plywood over E.C.'s broken bedroom window, and Fye gave E.C. rides to places. Fye testified that on August 29, 2022, he was dropped off at E.C.'s house in the morning. Fye and E.C.'s uncle Eric went to the bank, a pizza restaurant, and the liquor store. They returned to E.C.'s house around noon. Fye testified that when he got back to the house, E.C. asked him for a ride, and when he told her he did not have a vehicle that day, she told him to leave, so he did.

22.

### *Pecina's Motions Following the State's Case in Chief*

{¶ 68} After the state rested, Pecina renewed his motion to sever count 6 from the remaining counts. He also moved for acquittal on all six counts under Crim.R. 29. The trial court denied both motions.

### *Testimony of Jared Brooks*

{¶ 69} Pecina presented the testimony of one witness, Dr. Jared Brooks, a forensic pathologist board certified in anatomic pathology and forensic pathology. Dr. Brooks testified regarding his previous experience, stating that he had been employed with a medical examiner's office in Michigan for approximately three years and he had conducted 488 autopsies. In conjunction with this case, Dr. Brooks reviewed several records in E.C.'s death, including Dr. Scala-Barnett's report and photographs of E.C.'s body, but he did not examine E.C.'s body personally. Based on his review of the records, his expert opinion, to a reasonable degree of medical certainty, was that E.C.'s cause of death was ligature asphyxia but the manner of death was undetermined.

{¶ 70} Dr. Brooks explained that the use of ligature marks to distinguish between homicide and suicide was subject to disagreement in forensic pathology. He explained that in a classical approach to forensic pathology, ligature marks that are angled upward are associated with suicide, and horizontal ligature marks are associated with homicide. However, Dr. Brooks said that some forensic pathologists disagreed with this distinction. Dr. Brooks explained that if a person committed suicide via ligature strangulation by affixing the ligature to an object behind the person, such as a doorknob, rather than an object above the person, that would result in a horizontally oriented ligature mark.

23.

{¶ 71} In this case, therefore, Dr. Brooks opined that the horizontal ligature marks on E.C. alone were insufficient to conclude whether E.C.'s death was homicide or suicide, and circumstantial evidence was necessary to determine the manner of E.C.'s death. Dr. Brooks believed that the circumstantial evidence he reviewed, including E.C.'s drug use, was conflicting, so he opined that an undetermined manner of death was the most accurate.

### *Trial Motions, Jury Verdict, and Sentencing*

{¶ 72} After the close of all evidence, Pecina renewed his motion to sever, filed before trial, as well his Crim. R. 29 motion, both based on his previously articulated reasons. The trial court denied both motions.

{¶ 73} After deliberations, the jury found Pecina guilty on all counts. At sentencing, the trial court merged counts 1 through 5 as allied offenses of similar import, and the state elected to proceed to sentencing on count 1, aggravated murder.

## II. Assignments of Error

{¶ 74} Pecina asserts the following assignments of error for review:

1. The trial court erred when it denied appellant's motion to sever count 6 of the indictment from counts 1-5 pursuant to Ohio Rules of Criminal Procedures 8 and 14.

2. The trial court erred when it admitted hearsay statements pursuant to the rule of forfeiture by wrongdoing violating appellant's rights of confrontation and due process.

3. The state failed to present sufficient evidence to support finding appellant guilty of counts one (1) through five (5) and the finding of guilty was against the manifest weight of the evidence.

### III.  Law and Analysis

### A.  Motion to Sever

{¶ 75} In his first assignment of error, Pecina argues that the trial court abused its discretion in denying his motion to sever count 6, the domestic violence charge stemming from the incident on August 27, 2022, from counts 1 through 5, the charges relating to E.C.'s death on August 29, 2022.  Pecina argues that the trial court's first error was permitting the joinder of the charges in the same indictment.  He additionally contends he was prejudiced by the joinder of the charges because the state used the evidence concerning the domestic violence charge as impermissible character evidence, and he claims the state did not treat the domestic violence charge separately from the other charges.

{¶ 76} "The determination of whether to try two cases separately or jointly is within the discretion of the trial court."  *State v. Lowery*, 2020-Ohio-5549, ¶ 29 (6th Dist.).  Accordingly, an appellant challenging the trial court's denial of a motion to sever must establish the trial court abused its discretion.  *State v. Bradley*, 2015-Ohio-395, ¶ 9, citing *State v. Thompson*, 127 Ohio App.3d 511, 523 (8th Dist.1998).  An abuse of discretion implies that the trial court's attitude is unreasonable, arbitrary, or unconscionable.  *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶ 77} To promote judicial economy, Crim.R. 8 permits offenses to be charged in the same indictment if the charges "are of the same or similar character, or are based on the same act or transaction, or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of

criminal conduct." *See also State v. Clinton*, 2017-Ohio-9423, ¶ 43.  Indeed, "joinder is favored and is to be 'liberally permitted'" because it promotes judicial economy and preserves public resources.  *State v. Andrews*, 2023-Ohio-4237, ¶ 38 (6th Dist.), citing *State v. Stuckman*, 2018-Ohio-4050, ¶ 36 (6th Dist.), quoting *State v. Schaim*, 65 Ohio St.3d 51, 58 (1992).

{¶ 78} "Same or similar character" is not narrowly defined and may include offenses of widely varying degrees.  *See Schaim* at 58, fn. 6 (holding that the joinder of charges for rape, gross sexual imposition, and sexual imposition, each with different victims, was appropriate because they were of similar character).  Likewise, charges for offenses of varying degrees may be joined as a common scheme or plan if the incidents underlying the charges shared common elements, such as transpiring close in time, involving the same victim, occurring at the same location, or consisting of similar conduct.  *See State v. Hall*, 2021-Ohio-2968, ¶ 43 (6th Dist.) (concluding that joinder of aggravated burglary charge with charges for aggravated burglary and murder was appropriate when the two incidents that were the basis of the two sets of charges were closely related in time, involved the same victim, and were similarly executed); *State v. Conway*, 2008-Ohio-3001, ¶ 17 (2d Dist.) (holding that joinder of two burglary offenses with different victims was appropriate because "they appear to be part of a common scheme, plan or course of criminal conduct in that the two offenses were committed just days apart, at locations just two miles apart ...[that] share … common characteristic[s]").

{¶ 79} Here, the incident underlying the offense in count 6 occurred at the same location, E.C.'s residence; involved the same victim, E.C.; and occurred only two days

26.

before the incident underlying the offenses in counts 1 through 5.  Further, all of the charges, though they varied widely in degree, stemmed from the allegation Pecina caused E.C. physical harm because of turbulence in their romantic relationship.  Accordingly, the charges were of a similar nature and involved a common course of criminal conduct, and joinder of the charges in a single indictment was appropriate.

{¶ 80} Although charges may be appropriately joined under Crim.R. 8, a defendant may move to sever the counts pursuant to Crim.R. 14.  *Andrews* at ¶ 39.  If the defendant would be prejudiced by the joinder of the counts, then the court shall "order an election or separate trial of counts … or provide such other relief as justice requires." Crim.R. 14.  To establish prejudice, the defendant has the burden to provide sufficient information establishing that "the advantages of joinder and avoidance of multiple trials are outweighed by the right of a defendant to be tried fairly on each charge."  *State v. Reynolds*, 2018-Ohio-40, ¶ 31 (6th Dist.).

{¶ 81} A state may defeat a defendant's claim of prejudice using two methods. First, the state may demonstrate that even if the charges were tried separately, evidence of the separated charges would be admissible "other acts" evidence at trial under Evid.R. 404(B).  *State v. Brinkley*, 2005-Ohio-1507, ¶ 30.  Relevant to the evidence at issue in this case, many Ohio courts have determined that evidence of domestic violence is admissible under Evid.R. 404(B) in a murder trial involving the same victim as evidence of motive and intent.  *See, e.g., State v. Nields*, 93 Ohio St.3d 6, 22 (2001); *State v. Stanford*, 2024-Ohio-1451, ¶ 25-28 (10th Dist.); *State v. Thompson*, 2003-Ohio-3939, ¶ 26 (8th Dist.).  In *Nields*, the Ohio Supreme Court explained that evidence of a domestic

27.

violence incident weeks before the victim's murder showed a "tumultuous" and "strained" relationship" between the victim and the defendant, and therefore was evidence of the defendant's motive and intent as well as the absence of accident. *Nields* at 22.

{¶ 82} Second, the state may show that the evidence of the joined charges is "simple and direct." *Clinton*, 2017-Ohio-9423 at ¶ 44, quoting *State v. Lott*, 51 Ohio St.3d 160, 163 (1990). Here, the trial court determined that the evidence of the joined charges was both admissible "other acts" evidence as well as simple and direct. "Evidence is 'simple and direct' if (1) the jury is capable of readily separating the proof required for each offense, (2) the evidence is unlikely to confuse jurors, (3) the evidence is straightforward, and (4) there is little danger that the jury would 'improperly consider the testimony on one offense as corroborative of the other.'" *State v. Marshall*, 2023-Ohio-3542, ¶ 40 (6th Dist.), quoting *State v. Bradshaw*, 2023-Ohio-1244, ¶ 13 (3d. Dist.), quoting *State v. Valentine*, 2019-Ohio-2243, ¶ 48 (5th Dist.), quoting *State v. Wright*, 2017-Ohio-8702, ¶ 52 (4th Dist.).

{¶ 83} The Ohio Supreme Court applied both tests when it considered whether a domestic violence charge could be tried with a murder charge involving the same victim in *State v. Fry*, 2010-Ohio-1017. In that case, the appellant committed domestic violence, threatened and stalked the victim in an effort to get her to drop the domestic-violence charge against him, and then killed her. *Id.* The Court determined that the murder charge could be tried along with charges for domestic violence and menacing by stalking under the other-acts test, explaining that "[w]ithout evidence of the domestic-violence and menacing-by-stalking offenses, the state would have been unable to show

28.

what provoked [the appellant] to kill [the victim]." *Id*. at ¶ 199. As an additional basis, the Supreme Court also concluded that the evidence of each crime—though the state used one set of the offenses to explain the motive for committing the other—was simple and direct. *Id*. at ¶ 200.

{¶ 84} Here, the evidence regarding Pecina's domestic violence charge included E.C.'s 911 call and Officer Glass's body cam video from August 27, 2022. This evidence demonstrated that only two days before E.C.'s murder, E.C. and Pecina's relationship was tumultuous and E.C. pursued charges against Pecina, and therefore the evidence was probative of Pecina's motive to murder E.C.

{¶ 85} Moreover, like in *Fry*, although the state used the domestic-violence evidence to explain Pecina's motive and intent as to the other charges, the evidence of the offense itself was separate and distinct from the evidence relating to the other charges. A jury could distinguish between which evidence supported the domestic violence charge from the evidence of the other charges. Further, the bulk of the evidence regarding the domestic violence charge—E.C.'s 911 call, the testimony of Officer Gunden, and the recording from his bodycam—was presented at the outset of the trial before nearly all of the evidence regarding the other offenses. Accordingly, the trial court did not abuse its discretion in denying Pecina's motion to sever.

{¶ 86} Pecina's first assignment of error is found not well-taken.

## B. Forfeiture by Wrongdoing

29.

{¶ 87} Next, Pecina argues that the trial court erred in admitting Officer Glass's body cam video from August 27, 2022 containing E.C.'s statements. Pecina contends that the statements were inadmissible hearsay, the admission of which violated his right to confront witnesses against him. Although the trial court admitted these statements under the forfeiture-by-wrongdoing exception, Pecina claims that the trial court erred in doing so because there was no evidence to support that his purpose in murdering E.C. was to prevent her from testifying.

{¶ 88} "Forfeiture by wrongdoing has long been recognized as an equitable exception to a defendant's constitutional right to confront the witnesses against him." *State v. McKelton*, 2016-Ohio-5735, ¶ 96. Under this exception, "an accused has forfeited his confrontation right where the accused's own misconduct is responsible for a witness's unavailability." *State v. Hand*, 2006-Ohio-18, ¶ 105, citing *Crawford v. Washington*, 541 U.S. 36, 62 (2004). Because the admission of evidence under the forfeiture-by-wrongdoing exception implicates the Confrontation Clause, the trial court's admission of such evidence is reviewed de novo. *State v. Harvey*, 2022-Ohio-4650, ¶ 42 (6th Dist.), citing *McKelton* at ¶ 97.

{¶ 89} Under the forfeiture-by-wrongdoing exception, unconfronted testimony is admissible " 'only when the defendant engaged in conduct *designed* to prevent the witness from testifying' about an earlier offense." (Emphasis in original.) *McKelton* at ¶ 103, quoting *Giles v. California*, 554 U.S. 353, 366 (2008). Although the state must show that "the defendant intended to prevent [the] witness from testifying," this need not be the defendant's sole purpose in engaging in the conduct that prevented the witness

from testifying. *Id*. In addition, evidence that would otherwise be inadmissible as hearsay is admissible under the forfeiture by wrongdoing exception. Evid.R. 504(B)(6); *Harvey* at ¶ 44. Under Evid.R. 504(B)(6), the state must prove forfeiture by wrongdoing by a preponderance of the evidence, which may include circumstantial evidence. *State v. Dillion*, 2023-Ohio-777, ¶ 42 (10th Dist.).

{¶ 90} In a typical murder case, courts consider the immediate circumstances surrounding the victim's death, such as whether the murder was planned, to determine whether the defendant intended to make the victim unavailable. *McKelton* at ¶ 107. However, in cases in which there is a history of domestic violence between the defendant and the victim, a court may infer purpose from the broader circumstances. *Id*. at ¶ 108-111. Specifically, "courts should regard as 'highly relevant' any evidence of past abuse (or threats) designed to discourage a victim from seeking outside help, as well as evidence of ongoing criminal proceedings where the victim was expected to testify." *Id*. at ¶ 110.

{¶ 91} In *McKelton*, the Ohio Supreme Court noted that even though the record in that case "did not indicate that [the victim] ever reported domestic abuse to police or that she was expected to testify against [the defendant] in a pending criminal proceeding when she died," purpose could still be inferred from the evidence. *Id*. at ¶ 113. The victim's nieces testified that the defendant had abused the victim, the defendant took a phone away from one of the nieces when she tried to call 911 on one occasion, and the defendant was enraged on another occasion when the niece did call 911. *Id*. Based on

31.

this evidence, the Court concluded that the defendant "was trying to isolate [the victim] and prevent her from talking to authorities." *Id.*

{¶ 92} The record in this case provides even stronger support of the forfeiture by wrongdoing exception than in *McKelton*. Unlike the victim in *McKelton*, E.C. reported Pecina's domestic abuse to the police. Only two days before her death, E.C. called 911 to report domestic abuse, identified Pecina as the perpetrator, and told the operator she intended to press charges against him. In the recording of her 911 call, E.C. is heard speaking to someone nearby and telling the operator, "he's pushing me now," evidence that Pecina was in close proximity when E.C. told the 911 operator she wanted to press charges against him. Officer Grunden observed redness on E.C.'s face and a broken window in E.C.'s bedroom, and both E.C.'s father and friend testified that E.C. had bruises and appeared "beat up" in the two-day period between the domestic violence incident and her death. Moreover, on August 27, E.C. told Officer Travino that she had never pressed domestic violence charges against Pecina before because Pecina threatened to kill her.

{¶ 93} Pecina points out that he was not served with any paperwork relating to the charges or the temporary restraining order before E.C.'s death. Pecina knew, however, that the police were looking for him because of his altercation with E.C. on August 27. He told police in his interview on August 29 that he was hiding in E.C.'s room for much of the day for that very reason.

{¶ 94} Therefore, the record contains evidence of a history of domestic violence, E.C.'s initiation of criminal proceedings against Pecina only two days before her death,

32.

Pecina's knowledge that criminal proceedings arising out of that incident were likely imminent, Pecina's attempt to avoid the police, and Pecina's prior threats to kill E.C. to prevent her from reporting his abuse. Accordingly, the preponderance of the evidence supports an inference that one of Pecina's purposes in murdering E.C. was to make her unavailable to testify, and the trial court did not err in admitting E.C.'s out-of-court statements under the forfeiture by wrongdoing exception.

{¶ 95} Pecina's second assignment of error is found not well-taken.

## C. Sufficiency and Manifest Weight

{¶ 96} In his final assignment of error, Pecina challenges the sufficiency of the evidence to support a guilty verdict for the offenses in counts 1 through 5 of the indictment. He also contends that his conviction of those offenses was against the manifest weight of the evidence.

{¶ 97} In support of both challenges, Pecina makes the following arguments. First, Pecina argues that according to his medical expert, Dr. Brooks, the Lucas County Coroner could not conclude with a reasonable degree of medical certainty that E.C.'s manner of death was homicide or suicide based on the presence of horizontal ligature marks. In addition, Pecina claims that E.C.'s body showed no signs of a struggle and he had no marks on his body after E.C.'s death on August 29, which he contends is inconsistent with Pecina strangling E.C. Finally, Pecina asserts that the state's sole theory of the case—that he was motivated to murder E.C. because of their prior relationship issues—is not supported by the evidence, because he claims the evidence shows that the issues in their relationship were resolved on August 29. In support, Pecina

33.

points to the DNA evidence that they had sex that day, which he claims was consensual, and his recounting to police of conversations E.C. had with her family members on August 29, which he claims supports his statements that E.C. permitted him to enter and remain in her home for the day.

{¶ 98} As a preliminary matter, this court's analysis of Pecina's arguments is limited to count 1, aggravated murder. Counts 1 through 5 were merged, without objection, and the trial court proceeded to sentencing on count 1, aggravated murder, for sentencing. As this court has previously explained, merged counts for which no sentence was imposed are not subject to appellate review because no convictions exist for those counts. *See State v. Kinney*, 2025-Ohio-1620, ¶ 82 (6th Dist.); *State v. Quinn*, 2025-Ohio-1583, ¶ 58 (6th Dist.).

{¶ 99} Although Pecina makes the same arguments in support of his assertions that the evidence was insufficient to sustain the guilty verdict and his conviction was against the manifest weight of the evidence, "[i]nsufficiency and manifest weight are distinct legal theories." *State v. Collins*, 2024-Ohio-5730, ¶ 31 (6th Dist.), quoting *State v. Fenderson*, 2022-Ohio-1973, ¶ 73 (6th Dist.). In considering whether a verdict is supported by sufficient evidence, "the relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶ 100} When reviewing a sufficiency challenge, the appellate court does not weigh the evidence or assess witness credibility. *State v. Stuckman*, 2018-Ohio-4050, ¶ 34.

49 (6th Dist.). This principle also applies to expert witness testimony, and when considering whether a verdict was supported by sufficient evidence, courts do not resolve conflicts in opposing expert witness testimony. *See State v. Bey*, 2019-Ohio-1884, ¶ 39, 78 (8th Dist.) (including opinion of state's expert witness regarding victim's cause of death as evidence contributing to sufficiency of the evidence for murder despite conflict with defense expert witness's opinion); *see also State v. Ritchey*, 2023-Ohio-1625, ¶ 47 (11th Dist.), quoting *State v. Nemeth*, 82 Ohio St.3d 202, 210 (1998) (explaining that when an expert's opinion conflicts with the opinions of other members of the relevant scientific community, "[t]he credibility of the conclusion …[is] left to the trier of fact"). Instead, the sole inquiry is whether the state presented sufficient evidence, if believed, to satisfy its burden of production and sustain the verdict. *State v. Costilla*, 2024-Ohio-3221, ¶ 45.

{¶ 101} Here, to be successful on his sufficiency challenge, Pecina must demonstrate that the state failed to meet its burden to produce sufficient evidence of each element of aggravated murder under R.C. 2903.01(B). That statute provides that "[n]o person shall purposefully cause the death of another … while committing or attempting to commit … aggravated burglary...." R.C. 2903.01(B). Aggravated burglary is defined in R.C. 2911.11(A)(1), which states that "[n]o person, by force, stealth, or deception, shall trespass in an occupied structure … when another person other than an accomplice of the offender is present, with purpose to commit in the … any criminal offense, if … [t]he offender inflicts… physical harm on another."

35.

{¶ 102} As to "causing the death of another," the state presented the Lucas County Coroner's expert opinion that E.C.'s death was a homicide, she died by ligature strangulation, and the extension cord hanging from the fan was consistent with the ligature marks. Pecina's DNA was found on the cord, and in his statements to police, Pecina consistently maintained that no one else was around when he discovered E.C. and he was not aware of anyone in the house when E.C. died. Finally, Todd Cole found Pecina alone with an unresponsive E.C.

{¶ 103} As to "purposely," the state also presented evidence of Pecina's motive to cause E.C.'s death. E.C.'s 911 call and Officer Grunden's body cam footage demonstrated that Pecina and E.C.'s relationship was tumultuous and strained. Indeed, just two days before her death, E.C. told police that she wanted to press charges against Pecina, and Pecina was hiding from the police as a result. After the domestic violence incident on August 27, E.C. told a friend as well as her father that her relationship with Pecina was over and she wanted to move on with her life. Pecina, who was unemployed, depended on his relationship with E.C. for most of his basic necessities. Without her, he did not have a place to live. He also did not have his own cell phone and he had to use E.C.'s extra cell phone, which she took away when they were arguing. He told police his only source of income was the money E.C.'s uncle paid him to cut the grass, he owed E.C. over $1,000, and he had nowhere to shower in the days after E.C. kicked him out of her uncle's house. And during those days, E.C., whom Pecina referred to as his "wife" in his police interview, had been spending time with another man, Fye, in her bedroom while getting high. Fye even came over during the period Pecina claims he was stuck

36.

hiding in E.C.'s bedroom. Finally, just before her death—while Pecina claims he was hiding in the next room—E.C. tearfully reaffirmed to her father that she no longer wanted to be in a relationship with Pecina and she wanted to move on with her life.

{¶ 104} Next, there was evidence supporting the implausibility of Pecina's claim that E.C. hung herself from a ceiling fan with the extension cord. First, the state presented evidence that the ceiling fan in question was old, covered in thick, undisturbed dust, and "flimsy," and it was improperly and insecurely attached to a thin wood board in the ceiling. Moreover, the extension cord—which Pecina denied moving from the fan— was not attached to the fan's center mechanism and instead was resting, untied, near the fan blade.

{¶ 105} In addition, Dr. Brooks's opinion makes Pecina's claim that E.C. committed suicide less plausible rather than more plausible. Pecina repeatedly alleged that when he found E.C., she was partially seated in a dining room chair, hanging from an extension cord connected to the ceiling fan above her head. According to Dr. Brooks, however, horizontal ligature marks, like those found on E.C., are consistent with being strangled with a ligature affixed (or held) behind the decedent, not from being strangled with a ligature affixed above the decedent, like a ceiling fan.

{¶ 106} Finally, the state presented sufficient evidence of aggravated burglary. Pecina does not dispute that he entered E.C.'s residence, an occupied structure, where E.C. was present. Even if Pecina had E.C.'s consent to enter the residence initially, that consent was revoked once Pecina committed an act of violence against E.C., making Pecina a trespasser. *See State v. Brooks*, 2020-Ohio-3134, ¶ 22 (5th Dist.). Therefore, 37.

viewing the evidence in the light most favorable to the state, the state satisfied its burden to produce sufficient evidence to support a guilty verdict for aggravated murder.

{¶ 107} Turning to Pecina's contention that his conviction was against the manifest weight of the evidence, a different standard of review applies. A manifest weight challenge tests whether the state met its burden of persuasion. *Costilla*, 2024-Ohio-3221, at ¶ 46. "The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Lang*, 2011-Ohio-4215, ¶ 220, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). "We do not view the evidence in a light most favorable to the State; rather, we 'sit as a 'thirteenth juror' and scrutinize 'the factfinder's resolution of the conflicting testimony.' " *State v. Jackson*, 2024-Ohio-2419, ¶ 67 (6th Dist.), quoting *State v. Lewis*, 2022-Ohio-4421, ¶ 22 (6th Dist.), quoting *State v. Robinson*, 2012-Ohio-6068, ¶ 15 (6th Dist.). "Although we consider the credibility of witnesses under a manifest-weight standard, we must, nonetheless, extend special deference to the fact-finder's credibility determinations, given that it is the finder of fact that has the benefit of seeing the witnesses testify, observing their facial expressions and body language, hearing their voice inflections, and discerning qualities such as hesitancy, equivocation, and candor." *State v. Brooks*, 2023-Ohio-2978, ¶ 13 (6th Dist.), citing *State v. Fell*, 2012-Ohio-616, ¶ 14 (6th Dist.). "The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the

38.

conviction." *Fenderson*, 2022-Ohio-1973 at ¶ 73, quoting *Lang* at ¶ 220, quoting *Thompkins* at 387.

{¶ 108} Pecina makes three arguments in support of his contention that his conviction for aggravated murder was against the manifest weight of the evidence. First, he claims that based on the opinion of his expert witness, Dr. Brooks, the Lucas County Coroner could not conclude with reasonable degree of medical certainty that E.C.'s death was homicide rather than suicide. This amounts to a challenge of the credibility of the Lucas County Coroner's conclusion—in other words, he alleges that the jury should have believed the opinion of Dr. Brooks that the horizontal ligature marks could have resulted from suicide or homicide rather than that of the Lucas County Coroner that the marks indicated homicide.

{¶ 109} However, just as with the testimony of lay witnesses, the factfinder's role is to resolve conflicts in expert testimony. *See Bey*, 2019-Ohio-1884 at ¶ 87 (holding that in manifest-weight challenge involving competing expert opinions regarding victim's cause of death, the jury did not lose its way in believing the state's expert over the defense's expert); *State v. Wilson*, 2017-Ohio-8219, ¶ 38-40 (5th Dist.) (holding that conviction was not against the manifest weight of the evidence despite defense expert witness opinion that coroner could not conclude to a reasonable degree of medical certainty that the cause of death was homicide). In so doing, the factfinder may consider a number of factors, including the expert's experience, the expert's qualifications, the basis of the expert's opinion, and whether the expert merely conducted a record review rather than examining evidence in person. *State v. Price*, 2019-Ohio-1642, ¶ 72 (8th

39.

Dist.) (referring to significant difference in experience of different experts in explaining that a jury could have found one more credible than the other); *State v. Neff*, 2009-Ohio-6846, ¶ 19 (10th Dist.) (pointing out that state's expert witness personally conducted autopsy rather than merely doing a record review to explain why the jury could have found the state's expert opinion more credible).

{¶ 110} Here, the Lucas County Coroner performed the autopsy and had significantly more experience performing autopsies—she had performed over 15,000 over more than 30 years while Dr. Brooks had performed less than 500 over less than 3 years. And as already discussed, Dr. Brooks testified that horizontal ligature marks could result from suicide if the ligature causing the strangulation was affixed to an object behind a decedent's head, such as a doorknob, yet Pecina has repeatedly asserted that E.C. affixed the extension cord to the ceiling fan above her head. Dr. Brooks did not opine that horizontal ligature marks could result from the decedent hanging from an object on the ceiling. Therefore, a factfinder had grounds to determine that Dr. Brooks's statements regarding the horizontal ligature marks did not apply in this case.

{¶ 111} Pecina also contends that his conviction was against the manifest weight of the evidence because he claims E.C. and Pecina did not have any injuries or physical marks, nor were there any other signs of a struggle prior to E.C.'s death. Contrary to Pecina's assertion, the Lucas County Coroner noted injuries on E.C.'s fingers, an injury to her scalp under her hair, and bruising around her eye. In addition, blood was found under E.C.'s fingernails containing the DNA of a male. During Pecina's interview at the police station on the date of E.C.'s death, police questioned Pecina about scratches on his

arms and marks on his leg and torso.  Although Pecina told police that he received these injuries from the incident on August 27, the jury was free to discredit his explanation.

{¶ 112} Finally, Pecina claims that the state's theory of the case—that Pecina killed E.C. because of their tumultuous relationship—was inconsistent with E.C.'s actions on August 29.  Pecina points to their consensual sex that day as well as E.C. having multiple conversations with her family members while Pecina was present in the home as evidence that they had made up.  But Pecina's statements to police are the only evidence to support these assertions, and therefore they are entirely dependent on Pecina's credibility.  A jury could have discredited Pecina's characterization of his interactions with E.C. that day, especially considering his changing narrative of where he was when E.C. allegedly hung herself and how she was positioned when he found her.

{¶ 113} Moreover, even if Pecina's claim that he and E.C. had reconciled in the early hours of August 29 was credible, given the evidence of the recent turbulence between Pecina and E.C., the nature of their relationship may have changed again throughout the day.  Indeed, Todd Cole testified that E.C. told him that she had ended her relationship with Pecina for good and she was moving on with her life.  This conversation occurred two hours before Todd Cole returned to find E.C. dead, and it took place just outside of the room where Pecina claims he was hiding.  It was also the last time E.C. spoke to anyone, with the possible exception of Pecina.  Given the inconsistencies in Pecina's statements to police, a jury could have found Todd Cole's testimony that E.C. told him that she planned to end her relationship with Pecina shortly before her death to

41.

be more credible than Pecina's statements that they were reconciled at the time of E.C.'s death.

{¶ 114} This is not the exceptional case in which the jury clearly lost its way and the evidence weighs heavily against the conviction. Pecina's third assignment of error is not well-taken.

## IV. Conclusion

{¶ 115} Based on the foregoing, the judgment of the Lucas County Common Pleas Court is affirmed. Pecina is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.


Thomas J. Osowik, J.

_____
JUDGE

Gene A. Zmuda, J.

_____
Charles E. Sulek, P.J.                                           JUDGE
CONCUR.

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.